**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellant,

v.                                      No. 96-4235

DOUGLAS D. WILSON,
Defendant-Appellee.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                      No. 96-4250

DOUGLAS D. WILSON,
Defendant-Appellant.

Appeals from the United States District Court
for the Western District of Virginia, at Abingdon.
James C. Turk, District Judge.
(CR-95-19-ALL)

Argued: May 7, 1997

Decided: July 2, 1997

Before MURNAGHAN and MOTZ, Circuit Judges, and STAMP,
Chief United States District Judge for the Northern District of
West
Virginia, sitting by designation.

_____

Reversed in part, affirmed in part, and remanded by published opin-
ion. Judge Murnaghan wrote the opinion, in which Judge Motz and
Chief Judge Stamp joined.

_____

**COUNSEL**

**ARGUED:** Rick A. Mountcastle, Assistant United States Attorney, Abingdon, Virginia, for Appellant. Mark A. Swartz, Dina Mattingly Mohler, KAY, CASTO, CHANEY, LOVE & WISE, Charleston, West Virginia, for Appellee. **ON BRIEF:** Robert P. Crouch, Jr., United States Attorney, Michael Callaghan, Assistant United States Attorney, Abingdon, Virginia, for Appellant.

_____

**OPINION**

MURNAGHAN, Circuit Judge:

A federal jury convicted Defendant-Appellee Douglas Wilson of unlawfully and corruptly obstructing and impeding, and endeavoring to obstruct and impede, the administration of the internal revenue laws, in violation of 26 U.S.C.A. § 7212(a) (West 1989), and of willfully attempting to evade and defeat, and aiding and abetting in the evasion of, the payment of income and penalty taxes, in violation of 26 U.S.C.A. § 7201 (West 1989) and 18 U.S.C.A. § 2 (West 1969). The district court, however, set aside the jury's verdict and granted Wilson's motion for a judgment of acquittal on insufficiency of the evidence grounds. The government now appeals the district court's grant of Wilson's motion and argues that Wilson's conviction should be reinstated. Wilson cross-appeals the district court's denial of his alternative motion for a judgment of acquittal on statute of limitations grounds and his motion for a new trial. For the reasons stated below, we reverse in part, affirm in part, and remand for further proceedings.

I.

In the early 1980s, the Internal Revenue Service ("IRS") determined that Arthur Odell Rogers, the owner of several coal mining companies, owed over $400,000 in personal income taxes and over $700,000 in trust fund penalties for failing to pay income and social security taxes that his companies had withheld from their employees' wages. In 1985, the IRS began to collect the taxes that Rogers owed, and Rogers retained Defendant-Appellee Douglas Wilson, an attor-

2

ney, to represent him in his dealings with the IRS. The government contends that Wilson knowingly helped Rogers conceal assets from the IRS in order to prevent the IRS from attaching them.

A.

The government first argues that Wilson helped Rogers conceal stock and dividends that Rogers received from an Alaska gold mining venture known as Windfall Gold Mining Company ("Windfall"). The Windfall stock was not in Rogers's own name, but instead was in the name of two partnerships, Double R Associates ("Double R") and M & T Equipment ("M&T") (collectively, the "Partnerships"). Rogers was a partner in both Double R and M&T. In late 1985 or early 1986, the Partnerships assigned the Windfall stock to Wilson.

Rogers testified at trial that the Partnerships assigned the stock to Wilson in order to prevent the IRS from attaching it to pay the taxes that Rogers owed. Rogers also testified that he and Wilson agreed that Wilson would use dividends from the Windfall stock to pay $70,000 in legal fees that he owed Wilson and that he and Wilson would split any additional dividends. Charles Barnett, Wilson's law partner, testified that the Partnerships transferred the stock solely to pay the legal fees, but that as a condition of the transfer, Wilson would pay Rogers twenty-five percent of the dividends as a consulting fee for services that Rogers performed for the law firm. Rogers, however, testified that he did not perform consulting services and that the payments were his share of the dividends that Wilson owed him for the transfer of the stock.

During 1988, Wilson made two payments to Micca McKinney, Rogers's wife at the time. On February 12, 1988, Wilson's law firm wired $19,159 to a Phoenix bank account in McKinney's name. On May 23, 1988, Wilson gave Rogers a $15,000 personal check made payable to McKinney. Rogers testified at trial that the payments were for his share of the Windfall dividends that Wilson had received and that Wilson paid the dividends to McKinney, rather than to Rogers, in order to prevent the IRS from attaching them.

Wilson testified that only the first $19,159 payment was for a Windfall dividend. He further testified that the payment was merely

a loan. Wilson and Barnett testified that they did not want to turn the
dividends over to McKinney because there was a possibility that
Windfall would require the shareholders to pay the money back as a
capital contribution. They testified that Wilson therefore prepared a
note that Rogers and McKinney executed contemporaneously with the
$19,159 payment that required them to repay the money to Wilson.
The note was dated February 12, 1988, and it required Rogers and
McKinney to pay Wilson and his law partners $19,159 on demand.
Wilson further testified that the $15,000 payment was not for Wind-
fall dividends but instead was a personal loan to McKinney to help
her purchase stock in one of Rogers's companies, H.E.L. Coals. The
note was dated May 23, 1988, and it required Rogers and McKinney
to pay Wilson $15,000 on demand.

However, Rogers and McKinney testified that neither payment was
a loan. McKinney testified that Wilson drafted both notes only after
he learned on October 19, 1989 that the IRS was criminally investi-
gating Rogers and that Wilson backdated the notes to the dates of the
payments that he made to her.

B.

The government also argues that Wilson helped Rogers conceal his
assets in Victory Mining, Incorporated ("Victory"). From 1985
through early 1987, Rogers conducted his mining business under the
name of Victory. From May 1986 through January 1987, the IRS col-
lected some of the employment withholding taxes that Victory owed
by, among other things, attaching over $66,000 in Victory's bank
accounts, entering into an installment agreement with Rogers for pay-
ing the taxes that Victory and Rogers's other companies owed, and
placing Victory on a "special deposit program."[1] On January 30,
1987, however, IRS revenue officer John Svecz met with Wilson and
Rogers and told them that the installment agreement and special
deposit program were inadequate and that the IRS would begin "en-
forced" collection and would attach Victory's bank accounts and
assets (the "January 30, 1987 meeting").

_____
[1] The deposit program required Victory to open a bank account in trust
for the United States and to deposit employee withholdings into the
account within two days of the withholding.

4

Rogers testified that immediately after the January 30, 1987 meeting with Svecz, he met with Wilson and others at his home and they discussed removing funds from Victory's bank accounts and secreting them in a bank account in the name of Malcolm Van Dyke (the "Van Dyke account"), one of Rogers's employees. Wilson denied attending the meeting at Rogers's home. Later in the day on January 30, 1987, Wilson wrote a $4,000 personal check to Charter Federal Savings and Loan ("Charter Federal") to prevent Charter Federal from foreclosing on Rogers's home.

On February 2, 1987, Van Dyke, acting on orders from Rogers, removed the sum of $17,000 from Victory's three bank accounts and deposited it in the Van Dyke account to prevent the IRS from attaching it. Wilson testified at trial that he knew on February 2, 1987 that the IRS had issued levies on Victory's bank accounts. On February 3, 1987, Van Dyke wrote a $500 check on the Van Dyke account payable to Wilson's law firm in trust for Rogers. He also wrote a $4,000 check on the Van Dyke account payable to Wilson marked "repay loan to AOR [Rogers.]" When the banks received the IRS levies against Victory's accounts on February 3, 1987, only $295 remained in the accounts.

Wilson also drafted corporate documents for a new corporation, Symcor, Limited ("Symcor"), that would take over Victory's operations. Wilson testified that he drafted the corporate documents on December 3, 1986 and that two of Rogers's employees, John Lockhart and Michael Stevenson, signed the documents as the shareholders, directors, and officers of Symcor on January 5, 1987, before the January 30, 1987 meeting when Svecz told Rogers that he would begin attaching Victory's assets. Lockhart, however, testified that he and Stevenson signed backdated by-laws, board of directors minutes, and stock certificates around February 6, 1987. Rogers testified that he told Wilson to use Lockhart and Stevenson on the Symcor documents so that the IRS would not discover his interest.

Wilson also testified that he prepared assignments on January 5, 1987 that transferred Victory's mining lease to Symcor. Paula Smith, a notary at Wilson's law firm, testified that she notarized the assignments and watched the parties sign them on January 5, 1987. However, the president of Robinson-Phillips Coal Company, which had

5

originally leased its mining rights to Victory, testified that he signed the assignment document on February 9, 1987 and that he understood at the time he signed it that the document had been backdated to January 5, 1987 in order to avoid Victory's tax problems. On February 17, 1987, Wilson told Svecz that Victory was trying to sell its mining lease, but he failed to disclose that Victory had already assigned its lease to Symcor. As a result, Svecz issued additional unsuccessful levies against Victory.

C.

The government also contends that Wilson drafted additional backdated documents for other corporations and placed "strawmen" in the positions of officers and directors pursuant to Rogers's request in order to conceal Rogers's ownership interests. First, Wilson undisputedly prepared the corporate documents for a new mining corporation, Pandex. The documents named Tony Frederick and Richard Johnson, two of Rogers's employees, as the corporate officers. Frederick testified that in September or October 1987, Wilson told him how to funnel money out of Pandex to Rogers. Frederick testified that Wilson told him to write checks to Johnson, that Johnson would cash the checks, and that Johnson would then deliver the cash to Rogers. Frederick also testified that Wilson told him how to make it erroneously appear as if he had invested in Pandex.

In approximately November 1987, Rogers learned that Jasco Trucking Company ("Jasco"), another company that Rogers owned, had been used to pay some of Pandex's payroll and that Jasco therefore was liable for employment withholding taxes. Rogers became concerned that the IRS might assess his two sons, who were named on Jasco's corporate documents, for Jasco's tax liability. Rogers also wanted Johnson's name removed from Pandex's corporate documents because Johnson was also named on Jasco's corporate documents and he therefore was "tainted" by Jasco's tax liability. Frederick and Johnson testified that in October or November 1987, Wilson prepared, and had Frederick and Johnson sign, backdated Pandex board of directors minutes and stock certificates and had Johnson sign a backdated Pandex resignation. Rogers also testified that Wilson prepared backdated Jasco resignations for Rogers's two sons to prevent the IRS

from assessing them with Jasco's taxes. Rogers's son also testified that he signed a backdated resignation.

In addition, Stevenson testified that Wilson prepared unidentified documents for him to sign in April 1988. Stevenson testified that Wilson told him that the documents would get the "alligators" off of Rogers and onto Stevenson. Stevenson explained that the term "alligators" referred to the IRS.

Rogers also owned and operated Meridan of Virginia ("Meridan"), a leasing company that held the equipment that Rogers used in his mining operations. Frederick's name also appeared on Meridan's corporate documents. Frederick testified that in the spring of 1989, Wilson prepared, and had Frederick and others sign, backdated Meridan documents. Frederick testified that Wilson told him, "`You're going to sign in and sign out, all at the same time, of these corporations.'"

D.

On June 8, 1995, a federal grand jury returned an indictment against Wilson that charged him with one count of unlawfully and corruptly obstructing and impeding, and endeavoring to obstruct and impede, the administration of the tax laws, in violation of 26 U.S.C.A. § 7212(a) ("Count one"), and one count of willfully attempting to evade and defeat, and aiding and abetting in the evasion of, the payment of income and penalty taxes, in violation of 26 U.S.C.A. § 7201 and 18 U.S.C.A. § 2 ("Count two"). The United States District Court for the Western District of Virginia held a jury trial on December 4-12, 1995. Wilson made a motion for a judgment of acquittal after the close of the government's case and again after the close of all of the evidence. On both occasions, the district court denied Wilson's motion as to Count one and took the motion as to Count two under advisement.

On December 12, 1995, the jury convicted Wilson on both counts. Wilson filed a renewed motion for a judgment of acquittal on insufficiency of the evidence and statute of limitations grounds. He also filed a motion for a new trial. On February 12, 1996, the district court set aside the jury's verdict and granted Wilson's renewed motion for a judgment of acquittal as to both counts of the indictment on the

grounds of insufficiency of the evidence. The district court denied
Wilson's alternative motion for a judgment of acquittal on statute of
limitations grounds and also denied Wilson's motion for a new trial.

II.

The government argues that the district court erred in setting aside
the jury's verdict and entering a judgment of acquittal. We review the
district court's grant of a motion for a judgment of acquittal de novo.
See United States v. Campbell, 977 F.2d 854, 856 (4th Cir. 1992). We
must view the evidence in the light most favorable to the government
and inquire whether any rational trier of fact could find the essential
elements of the crime beyond a reasonable doubt. See Jackson v.
Virginia, 443 U.S. 307, 319 (1979). We may not weigh the evidence
or review the credibility of the witnesses. See United States v. Singh,
54 F.3d 1182, 1186 (4th Cir. 1995). Those functions are reserved for
the jury, and "if the evidence supports different, reasonable interpreta-
tions, the jury decides which interpretation to believe." Id. (quoting
United States v. Murphy, 35 F.3d 143, 148 (4th Cir. 1994)). We
address, in turn, the sufficiency of the evidence as to each count of
the indictment.

A.

In order to prove a violation of 26 U.S.C.A. § 7212(a), the govern-
ment must prove that the defendant: 1) corruptly; 2) endeavored; 3)
to obstruct or impede the administration of the Internal Revenue
Code. See United States v. Bostian, 59 F.3d 474, 477 (4th Cir. 1995),
cert. denied, 116 S.Ct. 929 (1996); United States v. Williams, 644
F.2d 696, 699 (8th Cir. 1981). Wilson contends that the government
failed to prove the first element, namely, that he had a "corrupt" pur-
pose. We have held that the term "corruptly," as used in the statute,
forbids acts committed with the intent to secure an unlawful benefit
either for oneself or for another. See Bostian, 59 F.3d at 479; United
States v. Mitchell, 985 F.2d 1275, 1277-79 (4th Cir. 1993). The

acts
themselves need not be illegal. Even legal actions violate §
7212(a)
if the defendant commits them to secure an unlawful benefit for
him-
self or others. See Bostian, 59 F.3d at 479.

The jury in the instant case heard ample evidence that Wilson acted
with the intent to secure unlawful benefits for himself and for
Rogers.

8

We list only a few examples here. First, the jury could infer that Wilson acted with the intent to secure an unlawful benefit for Rogers when he prepared backdated notes to make the Windfall dividend payments to McKinney appear to be nontaxable loan payments. Both Rogers and McKinney testified that the payments were not loans. Rogers testified that he did not sign the two notes on the dates printed on the notes. McKinney testified that Wilson drafted the backdated notes only after they learned that the IRS had begun a criminal investigation of Rogers.

The jury also could infer from the evidence presented that Wilson acted with the intent to conceal Victory's assets in order to prevent the IRS from attaching them. IRS revenue officer Svecz testified that he told Wilson and Rogers on January 30, 1987 that he intended to enforce collection and to begin attaching Victory's assets. Rogers testified that he met with Wilson immediately after the meeting and that they discussed removing funds from Victory's bank accounts and secreting them in the Van Dyke account to prevent the IRS from attaching the money. Wilson's intent to benefit both himself and Rogers was corroborated by the evidence that Van Dyke wrote a $4,000 personal check to Wilson from the Van Dyke account the day after he removed the funds from Victory's bank accounts.

The government also introduced substantial evidence that Wilson prepared corporate documents with the intent to conceal Rogers's interest in Symcor in order to prevent the IRS from holding Rogers liable for Symcor's employment withholding taxes. Lockhart and Stevenson both testified that they went to Wilson's office on February 6, 1987 and signed corporate documents as the Symcor shareholders, directors, and officers. Ample evidence existed for the jury to find that Wilson knew that Lockhart and Stevenson were "strawmen" and that Rogers really controlled Symcor. For example, Rogers testified as follows:

> Q: Did you tell Doug Wilson, "My name cannot be on any paperwork at Symcor." That's the question.
>
>  . . . .
>
> A: Well, I'm sure I did.

9

Q: And why did you tell Mr. Wilson that your name could
not be on any paperwork for Symcor?

A: Well, I had the IRS tax problems. He knew that, too.

Ample testimony also existed for the jury to find that Wilson back-
dated the Symcor corporate documents to appear as though the
parties
incorporated Symcor before the January 30, 1987 meeting. Both Ste-
venson and Lockhart testified that they did not sign the papers on
the
dates printed on the documents. Moreover, Harsanyi testified that
he
understood that the mining lease assignment was backdated when he
signed it because of Rogers's tax problems.

Substantial evidence also existed for the jury to infer that
Frederick
and Johnson were merely strawmen to conceal Rogers's interest in
Pandex and that Wilson prepared Pandex's corporate documents with
the intent to confer an unlawful benefit on Rogers. Frederick
testified
that Wilson knew that Rogers owned and controlled Pandex and that
Frederick and Johnson were merely strawmen. Frederick further
testi-
fied that Wilson told him how to evade the IRS. Specifically,
Freder-
ick testified as follows:

Q: What was said about capital investment?

A: I didn't have any money to start a corporation, and it
had to appear as though I did.

Q: Who said it had to appear as though --

A: [Financial Advisor Roy Debo] and [Wilson]. So, there-
fore, the term capital investment, I had to show some
investment into the corporation to give the appearance
that I did, in fact, own it.

Q: That's what you were told by Mr. Debo and Mr. Wil-
son?

A: Correct.

Q: What was your response to that?

10

A: "Where's the money going to come from?"

Q: Was there an answer?

A: Yes. The money would come from . . . the new corpo-
ration's general account. They'd give it to me, I would
open a personal account at the same bank with the,
where the general account was, write a check out of the
personal account, and deposit it back into the regular
account, and note on the check, "capital investment."

 . . . .

Q: Now, who told you about that?

A: [Debo] and [Wilson].

Q: Now, you mentioned that also there was discussion
about how Mr. Rogers was going to get his money out
of the corporation?

A: Yes.

Q: What do you recall? Do you recall anything else about
that discussion?

A: Not a lot other than it was going to be complicated, and
I think -- [Rogers's] wife was mentioned in the con-
versation, but I think generally in the outset that the
money was going to, there would be a check written to
Rick Johnson, and [Johnson] would cash a check and
just take the money to [Rogers].

Thus, the jury clearly could infer from the testimony at trial that
Wilson acted with the intent to secure unlawful benefits for
himself
and for Rogers by concealing Rogers's business activities and
sources
of income from the IRS. Cf. United States v. Popkin, 943 F.2d 1535,
1540 (11th Cir. 1991) (holding that sufficient evidence supported
an
attorney's § 7212(a) conviction where the evidence demonstrated
that

11

the attorney created a shell corporation to help his client conceal taxable income). Wilson's testimony did refute most of the government's evidence, and his witnesses corroborated parts of his testimony. He also raised serious questions about the credibility of some of the government's witnesses and about conflicts between McKinney's grand jury testimony and her trial testimony. However, "[w]here there are conflicts in the testimony, it is for the jury and not the appellate court to weigh the evidence and judge the credibility of the witnesses." United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir. 1982). We conclude that the government introduced sufficient evidence for a rational jury to find Wilson guilty beyond a reasonable doubt of violating § 7212(a).

B.

In order to establish a violation of 26 U.S.C.A. § 7201, the government must prove: 1) that the defendant acted willfully; 2) that the defendant committed an affirmative act that constituted an attempted evasion of tax payments; and 3) that a substantial tax deficiency existed. See United States v. Goodyear, 649 F.2d 226, 227-28 (4th Cir. 1981). The jury may infer a "willful attempt" from "any conduct having the likely effect of misleading or concealing." Id. at 228. We have specifically held that a defendant violates§ 7201 if he makes false statements to the IRS for the purpose of concealing income. Id.

In the instant case, the government introduced substantial evidence that Wilson willfully committed affirmative acts that would likely mislead the IRS or conceal Rogers's assets. Among other things, the government introduced evidence that Wilson: 1) prepared and executed false, backdated notes to make the Windfall dividend payments look like nontaxable income; 2) participated in a meeting where he discussed removing money from Victory's bank accounts in order to prevent the IRS from attaching the money; 3) told IRS revenue officer Svecz that Victory was trying to sell its mining rights when he knew that Symcor had taken over Victory's operations and that Victory had already transferred its mining rights to Symcor; 4) prepared numerous corporate documents for Symcor, Pandex, and Meridan that knowingly named "strawmen" as officers and directors; and 5) told Freder-

ick how to funnel money from Pandex to Rogers and how to make it appear as though Frederick had invested in Pandex.

12

The government also introduced sufficient evidence that a "substantial tax deficiency" existed. Rogers undisputedly owed over $400,000 in personal income taxes and over $700,000 in penalty taxes. Such amounts clearly constitute a substantial tax deficiency. See Goodyear, 649 F.2d at 227-28 (holding tax deficiencies totaling less than $24,000 sufficient to uphold the defendants' § 7201 convictions).

Thus, although Wilson's testimony refuted the government's evidence, a rational jury could have found Wilson guilty beyond a reasonable doubt of violating § 7201. We therefore reverse the district court's grant of Wilson's motion for a judgment of acquittal as to both counts on insufficiency of the evidence grounds.

III.

Wilson also moved for a judgment of acquittal on the ground that the applicable statute of limitations barred the government's prosecution of both counts of the indictment. The district court denied Wilson's motion on that ground and found that the government sufficiently proved that Wilson committed an unlawful act within the limitations period.

The government bears the burden of proving that it began its prosecution within the statute of limitations period. See United States v. Ferris, 807 F.2d 269, 272 (1st Cir. 1986). The applicable statute of limitations for both counts of the indictment is six years. See 26 U.S.C.A. § 6531(2),(6) (West 1989). The limitations period for a violation of § 7201 begins to run on the date of the last affirmative act of tax evasion. See Ferris, 807 F.2d at 271-72; United States v. Bartrug, 777 F.Supp. 1290, 1292 (E.D. Va. 1991), aff'd on other grounds, 976 F.2d 727 (4th Cir. 1992). The limitations period for a violation of § 7212(a) similarly begins to run on the date of the last corrupt act. Cf. United States v. Workinger, 90 F.3d 1409, 1412-14 (9th Cir. 1996) (holding that the statute of limitations did not bar the defendant's § 7212(a) prosecution where the defendant committed the last corrupt act within six years of the indictment). Thus, in the instant case, the government had to prove that Wilson committed an affirma-

tive act in furtherance of the two charges in the indictment on or after April 1, 1989.[2]

The government introduced sufficient evidence at trial that Wilson committed an unlawful act within the limitations period. Rogers and McKinney testified that the two payments that Wilson made to McKinney in 1988 were for Rogers's share of the Windfall dividends. Both also testified that neither payment was a loan. Rogers testified that he could not remember when he signed the two false notes. However, McKinney clearly testified that she, Rogers, and Wilson executed the false notes that Wilson prepared after October 24, 1989 when they first learned that the IRS was criminally investigating Rogers. As noted above, the jury could infer that Wilson's action violated § 7212(a) and § 7201. Since the action occurred within the limitations period, the district court properly denied Wilson's motion for a judgment of acquittal on statute of limitations grounds.

IV.

Wilson finally argues that the district court erred in denying his motion for a new trial. He argues that the district court should have granted a new trial on three grounds. We address each of his arguments in turn.

A.

Wilson first contends that the district court should have granted his motion for a new trial because the jury's verdict was against the weight of the evidence. We have held that a district court should exercise its discretion to grant a new trial "sparingly" and that the district court should grant a new trial based on the weight of the evidence "only when the evidence weighs heavily against the verdict." United States v. Arrington, 757 F.2d 1484, 1486 (4th Cir. 1985). We review the district court's denial of a motion for a new trial based on the weight of the evidence for abuse of discretion. Id.

_____

[2] The government filed the indictment against Wilson on June 12, 1995. However, Wilson waived the statute of limitations for the period between April 1, 1995 and July 1, 1995.

14

The district court in the instant case did not abuse its discretion in
denying Wilson's motion for a new trial based on the weight of the
evidence. As fully described above, abundant evidence supports the
jury's verdict. Numerous witnesses testified regarding Wilson's viola-
tions of §§ 7212(a) and 7201.

B.

Wilson also moved for a new trial on the ground that the district
court's conduct throughout the trial unfairly and negatively influenced
the jury. He contends that the district court's "persistent intervention"
in the direct and cross-examination of witnesses prejudiced him and
required the district court to grant a new trial. We review the district
court's denial of a motion for a new trial based on partiality or bias
for abuse of discretion. See United States v. Castner, 50 F.3d 1267,
1272 (4th Cir. 1995).

The district court must "conduct a jury trial `in a general atmo-
sphere of impartiality.'" Castner, 50 F.3d at 1272 (quoting United
States v. Cassiagnol, 420 F.2d 868, 878 (4th Cir. 1970)). Moreover,
"the court `must not create "an appearance of partiality by continued
intervention on the side of one of the parties or undermine[ ] the
effective functioning of counsel through repeated interruption of the
examination of witnesses."'" Id. (alteration in original) (quoting
United States v. Norris, 873 F.2d 1519, 1526 (D.C. Cir. 1989) (quot-
ing United States v. Liddy, 509 F.2d 428, 439-39 (D.C. Cir. 1974) (en
banc))). However, Federal Rule of Evidence 611(a) provides that the
district court must exercise reasonable control over the presentation
of evidence and the interrogation of witnesses in order to "ensure the
effective determination of the truth, to avoid needless waste of time
in the presentation of a case, and to circumvent undue witness intimi-
dation and embarrassment." Id. Moreover, Federal Rule of Evidence
614(b) permits the court to interrogate witnesses directly. Id. Espe-
cially in a complex case that involves numerous witnesses, such as the
instant one, the district court must ensure that the facts are properly

developed and that the jury clearly understands their bearing on the
questions at issue. <u>Id.</u>

Wilson points to many examples throughout the trial where the district court questioned witnesses. After reviewing the transcript, how-

15

ever, we conclude that the district court merely clarified witness testimony and did not impose its own view of the evidence on the jury. The court questioned defense and government witnesses, and the questions did not indicate partiality for either side. The record reveals that the district court "was simply fulfilling its obligation to clarify confused factual issues or misunderstandings, to correct inadequacies of examination or cross-examination, and to `"otherwise insure that the trial proceed[ed] efficiently and fairly."'" Castner, 50 F.3d at 1273 (alteration in original) (quoting United States v. Morrow, 925 F.2d 779, 781 (4th Cir. 1991) (quoting United States v. Cole, 491 F.2d 1276, 1278 (4th Cir. 1974))). Thus, the district court did not abuse its discretion in denying Wilson's motion for a new trial based on partiality or bias.

C.

Wilson finally contends that the district court should have granted a new trial because it erroneously admitted irrelevant evidence at the trial. Prior to the trial, Wilson made a motion to strike several paragraphs of the indictment from the jury's consideration and to prevent the government from admitting evidence based on the allegations in those paragraphs. The paragraphs at issue relate to the § 7212(a) charge and refer to: 1) false financial forms that Wilson prepared and transmitted to the IRS; 2) Wilson's participation in the discussion regarding the removal of funds from Victory's bank accounts; 3) the $4,000 check that Wilson gave to Charter Federal to prevent the foreclosure of Rogers's house and its repayment; 4) Wilson's backdating of Rogers's sons' resignations; 5) the corporate document that Stevenson signed to get the "alligators" off of Rogers and onto Stevenson; 6) the Pandex sublease; 7) the backdating of Meridan corporate documents; and 8) Wilson's delivery of fraudulent documents to the IRS. The district court denied Wilson's motion. Although Wilson objected to the district court's denial of his motion to strike, he did not contemporaneously object to the evidence related to the disputed paragraphs of the indictment when the government offered it at trial.

Since Wilson failed to object at trial to the admission of the evidence, the government contends that we may review the district

court's admission of the evidence only for plain error pursuant to
Fed-

eral Rule of Evidence 103(d).**3** However, we have clearly held that motions in limine will "preserve issues that they raise without any need for renewed objections at trial, just so long as the movant has clearly identified the ruling sought and the trial court has ruled upon it." <u>United States v. Williams</u>, 81 F.3d 1321, 1325 (4th Cir. 1996). In the instant case, Wilson based his pretrial motion to strike on the precise issue he now seeks to raise, and the district court expressly denied the motion. Therefore, Wilson's motion to strike adequately preserved the issue, and we review the district court's admission of the evidence for harmless error rather than for plain error. Thus, we inquire whether the district court erred in admitting the evidence and whether the error affected Wilson's substantial rights. <u>See United States v. Lamarr</u>, 75 F.3d 964, 970 (4th Cir. 1996), <u>cert. denied</u>, 117 S.Ct. 358 (1996).

The district court's admission of the evidence was not error. Wilson contends that the evidence was irrelevant. However, the Federal Rules of Evidence define relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. As discussed throughout our opinion, the evidence that Wilson objects to was clearly relevant to the § 7212(a) charge. The evidence made Wilson's intent to secure an unlawful benefit for himself and Rogers more probable than it would have been without the evidence. Therefore, the district court did not err in admitting the evidence, and it consequently did not abuse its discretion in denying Wilson's motion for a new trial on that ground. Thus, we conclude that the district court properly denied all three of Wilson's asserted grounds for a new trial.

V.

Accordingly, we reverse the district court's grant of Wilson's motion for a judgment of acquittal on insufficiency of the evidence grounds. We affirm the district court's denial of Wilson's motion for an acquittal on statute of limitations grounds. We also affirm the dis-

---

**3** Rule 103(d) allows us to "tak[e] notice of plain errors affecting

sub-
stantial rights although they were not brought to the attention of the
court." Fed. R. Evid. 103(d).

17

trict court's denial of Wilson's motion for a new trial. We therefore reinstate the jury's verdict and remand the case to the district court for sentencing.

REVERSED IN PART, AFFIRMED IN PART, AND REMANDED

18