**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 09-5070**

UNITED STATES OF AMERICA,

        Plaintiff - Appellant,

    v.

WILLIAM CARL SOUDER, JR.; MARVIN DEAN CHAMBERS, SR.; ALVIN
LEWIS ELLIOTT, SR.,

        Defendants – Appellees.

Appeal from the United States District Court for the Middle
District of North Carolina, at Greensboro.  James A. Beaty, Jr.,
Chief District Judge.  (1:08-cr-00136-JAB-1)

Argued:  March 25, 2011        Decided:  June 30, 2011

Before TRAXLER, Chief Judge, and WILKINSON and DIAZ, Circuit
Judges.

Affirmed in part, reversed in part, and remanded by unpublished
opinion.  Judge Diaz wrote the opinion, in which Chief Judge
Traxler and Judge Wilkinson joined.

**ARGUED:**  Frank J. Chut, Jr., OFFICE OF THE UNITED STATES
ATTORNEY, Greensboro, North Carolina, for Appellant.  James E.
Ferguson, II, FERGUSON STEIN CHAMBERS GRESHAM & SUMTER, P.A.,
for Appellees.  **ON BRIEF:**  Anna Mills Wagoner, OFFICE OF THE
UNITED STATES ATTORNEY, Greensboro, North Carolina, for
Appellant.  Thomas H. Johnson, Jr., GRAY, JOHNSON & LAWSON, LLP,

for Appellee Souder; Eric D. Placke, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Greensboro, NC, for Appellee Elliott.

---

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Circuit Judge:

William Carl Souder, Jr., Marvin Dean Chambers, Sr., and Alvin Lewis Elliott, Sr. ("Defendants") were indicted in Greensboro, North Carolina on nine counts of mail fraud in violation of 18 U.S.C. § 1341. The Defendants, along with a fourth co-defendant, James Henry Wilcher, were also charged in a second indictment with honest services mail fraud in violation of 18 U.S.C. §§ 1341 and 1346. After a thirteen-day trial that began on June 30, 2009, the jury returned guilty verdicts against the Defendants as to all counts in both indictments, but acquitted Wilcher.

The Defendants filed a joint post-verdict motion for judgment of acquittal, which the district court granted. The district court also conditionally granted a new trial. The government timely appealed.[1] We hold that the district court erred in granting judgment of acquittal and therefore reverse as to that issue. Applying the much more deferential "abuse of discretion" standard to the district court's decision to conditionally grant a new trial, we affirm that ruling, and remand for further proceedings.

---

[1] The government has since dismissed its appeal with respect to the honest services mail fraud charges in the second indictment.

3

I.

We review first the trial court's order granting the Defendants' motion for judgment of acquittal. As to this issue, we view the evidence in the light most favorable to the government and recite the facts accordingly.

This case stems from a supplemental life insurance program developed by the Defendants for the Most Worshipful Prince Hall Grand Lodge of Free and Accepted Masons of North Carolina and Jurisdiction, Inc. ("Grand Lodge"). The Grand Lodge oversees approximately three hundred local Masonic lodges scattered throughout North Carolina, which, at the time of these events, boasted over 18,000 individual members or Masons. Defendants Chambers and Elliott were salaried officers of the Grand Lodge, serving as Grand Master and Grand Secretary, respectively. Defendant Souder was President and CEO of Atlanta Life General Agency, Inc. ("ALGA"), a corporate subsidiary of Atlanta Life Insurance Company. ALGA's primary business was the sale of insurance products underwritten by other companies, from which it earned commissions. Defendant Wilcher was an insurance agent and owner of the Wilcher Group, based in Johnsonville, South Carolina.

Stated broadly, the government's theory of the case was that the Defendants misrepresented the terms of the supplemental

4

life insurance program to the Masons by, at least in some instances, binding Masons (and the Grand Lodge) to pay premiums on insurance policies that (1) exceeded the amount of the death benefit sought by the Mason, and (2) named the Grand Lodge as a partial beneficiary without the Mason's consent. In furtherance of the alleged scheme, the Defendants mailed so-called "certificates of insurance" to Masons that understated the amount of insurance obtained by the Mason and failed to disclose that the Grand Lodge was a partial beneficiary of the policy. According to the government, this scheme directly benefitted Souder, in that he earned commissions on all policies issued, and had the potential to benefit Chambers and Elliott, who, as the Grand Lodge's senior officers, would have free rein over the use of the death benefit proceeds accruing to the Grand Lodge.

Before offering the supplemental insurance program at issue in this case, the Grand Lodge provided each Mason a $500 benefit, payable to a surviving beneficiary upon a Mason's death. This death benefit was paid from the Grand Lodge's "Benevolence Fund," which was funded primarily by the Masons' annual dues. Benevolence Fund monies were held in trust by the Grand Lodge and were to be used for the purpose of paying death benefits to beneficiaries.

In late 2001 or early 2002, Chambers met Wilcher at a conference where they discussed the prospect of developing a supplemental insurance program for the Grand Lodge. Chambers told Wilcher that any such program would have to satisfy certain requirements, to wit: (1) every Mason had to be able to qualify without, or with only a modest, physical examination; (2) issued policies had to be whole life; and (3) the premium structure had to allow for payment by both the insured Mason and the Grand Lodge.

Unable to implement Chambers's concept, Wilcher introduced Chambers to Souder. Chambers and Souder met in Atlanta several times to discuss the program. On or about May 16, 2002, Souder spoke with Jayne Silven, a vice president serving special insurance markets for American Heritage Life Insurance Company ("American Heritage"), about the insurance program. As Souder described the program to Silven, the Grand Lodge would own the individual policies and be responsible for collecting premiums from the Masons. Masons under the age of 65 would be eligible for $25,000 of coverage, while those aged 65 to 75 could obtain $10,000 in coverage. Any death benefit paid on $25,000 policies

6

would be split between the insured's beneficiary and the Grand Lodge.[2]

After conducting due diligence, American Heritage agreed to underwrite the insurance program. In its final form, the program provided that the Grand Lodge would receive $15,000 of any death benefit paid under a $25,000 policy, with the beneficiary designated by the Mason receiving the $10,000 balance.

Chambers convened a special session meeting of the Grand Lodge at its headquarters in Durham, North Carolina on May 25, 2002, where he announced the new insurance program to the Grand Lodge's regional directors, deputy wardens, and some rank and file Masons in attendance. Many of the attendees were there in a representative capacity, sent to gather information about the program to disseminate to their respective local lodges.

Several hundred Masons attended the May 25 meeting, along with more than a hundred members of the Grand Lodge's sister organization, the Order of the Eastern Star. Chambers explained that the program would supplement the death benefits offered

---

[2] At trial, several witnesses described this type of split beneficiary arrangement as a "legacy" program, which is commonly used in the insurance industry as a funding mechanism for charitable organizations.

through the Benevolence Fund and encouraged Masons to apply. Souder described the program as a voluntary plan providing a $10,000 death benefit to the beneficiary of the Mason's choice. Souder also provided a written summary of the program that listed the $10,000 benefit amount and advised the Masons that they would have to pay $5.50 per week for the coverage, with the Grand Lodge paying the entire premium for the first quarter that the individual policies were in place, and thereafter providing a weekly $3.00 subsidy for each Mason's policy. At the meeting, some Masons expressed concern about the impact of the new program on the Benevolence Fund, but Chambers disclaimed any intent to use money from the Fund to pay premiums for the insurance program.

Chambers told those present at the meeting that the Grand Lodge would be the owner of the policies, would maintain the policies, and would issue certificates to Masons choosing to participate in the program. However, neither Chambers nor Souder disclosed that the program they were contemplating would also provide a $25,000 policy option that would partially benefit the Grand Lodge. To the contrary, Chambers affirmatively represented that the Grand Lodge would not benefit from the program. In response to an inquiry as to whether the Grand Lodge would receive any portion of the $10,000 death

8

benefit, Souder stated that each Mason would determine his beneficiary and "[t]hat person will receive the $10,000." J.A. 2900 (transcript of tape recording of May 25, 2002 meeting). Chambers added, "[I]f you want to make the Grand Lodge the beneficiary, we get the $10,000." Id.

On June 4, 2002, ALGA and American Heritage signed a formal letter of intent to issue $10,000 and $25,000 policies. ALGA also engaged a second insurance company, Presidential Life Insurance Company ("Presidential Life"), to provide $10,000 insurance coverage for those Masons who failed to qualify for American Heritage policies. Although disputed by the Defendants, the government's evidence showed that at the time of the May 25 special session meeting, American Heritage was the only insurance company then being solicited by the Defendants to provide coverage to the Masons.

On June 15, 2002, after ALGA and American Heritage signed a letter of intent to provide insurance coverage--to include $25,000 split beneficiary policies--Chambers presented the program to the executive committee of the Order of the Eastern Star. Again, Chambers did not disclose that the Grand Lodge would be a partial beneficiary on any $25,000 policies issued, although he briefly mentioned that the Grand Lodge expected to

9

obtain some return on the program if there was sufficient participation.[3]

Following these meetings, various regional and local lodge meetings were held around the state to inform Masons about the availability of the supplemental insurance program and to explain its benefits. From June 2002 to August 2003, between six and seven hundred Masons across the state applied for insurance coverage through the program; approximately three hundred $25,000 policies were issued and approximately three hundred and fifty $10,000 policies were issued.

ALGA was responsible for administering the program and processing the insurance applications. Each of the Defendants participated in teleconferences discussing the manner in which ALGA would process Mason applications. During one such teleconference, Defendant Elliott stated "[t]hat the agents [processing the applications] should not disclose the face amount of the policy to the applicants." Id. 1015.

Souder and Gloria Giles, the assistant vice president of training and development at ALGA, trained the policy writing

---

[3] According to Chambers, this return would come in the form of unspecified "residuals" that would flow back to the Grand Lodge.

agents, both in person at ALGA's offices in Atlanta and via teleconference. Giles, who reported directly to Souder, instructed agents not to complete the application fields relating to the face amount of the death benefit or the beneficiary designation. Agents were directed to deliver the signed applications to Souder's attention at ALGA. ALGA would then determine the face amount of the death benefit, calculate the premium, and name the Grand Lodge as a beneficiary for Masons who qualified for $25,000 policies.

When a Mason applied for insurance under the program, he also signed a "Required Disclosure Statement for Accelerated Benefit Rider," ("Rider") which informed the Mason that he might be eligible for an advance of a percentage of the death benefit, in the event he was diagnosed with a terminal illness. The Riders also contained a generic statement that "The minimum face amount of a policy that this rider may be attached to is $25,000." The Riders, however, were attached to all applications, only some of which resulted in the issuance of $25,000 policies. Further, the Riders did not alert Masons that the Grand Lodge would be a beneficiary on $25,000 policies.

After issuing the policy, American Heritage delivered it to ALGA, which then sent it to Chambers and Elliott along with a request that the Grand Lodge remit the premium payment. The

11

Grand Lodge did not forward policies to insured Masons but instead retained them in its files. However, to provide insured Masons with some evidence of their arrangement with the Grand Lodge, Elliott and Chambers, with the assistance of Gloria Giles at ALGA, prepared certificates of insurance that (1) listed the name of the Mason's designated beneficiary, (2) identified the Grand Lodge as the owner of the policy, (3) represented that the Mason was entitled to a $10,000 death benefit, and (4) advised the Mason that his share of the monthly insurance premium was $22.00. The certificates did not, however, disclose the face amount of policies issued for $25,000, did not reflect that the Grand Lodge was a beneficiary of those policies, and listed a uniform "policy number" (79647) that did not match the individual Mason's policy number.[4] Chambers and Elliott signed the certificates and mailed them to participating Masons.[5]

At the annual Grand Lodge meeting in October 2003, Chambers and Elliott represented in writing that the supplemental insurance program was a success and that it provided a $10,000

---

[4] This number instead referred to the uniform billing number created by ALGA.

[5] The misrepresentations and omissions contained in the certificates of insurance underpinned the government's nine-count indictment alleging mail fraud.

12

benefit to participating Masons. Chambers and Elliott did not then disclose that some Masons had been insured for $25,000 without their knowledge or that the Grand Lodge was a beneficiary of such policies.

In 2003, Chambers was defeated in his bid for re-election as Grand Master. The new Grand Lodge leadership terminated the insurance program, after discovering that the Grand Lodge had paid over $300,000 in premiums, a portion of which was funded through the Grand Lodge's Benevolence Fund. Individual Masons paid over $50,000 in insurance premiums. Moreover, only one insured Mason died during the time the program was in operation, and his claim for benefits was denied.

At trial, several Masons testified that they were unaware they had been insured for $25,000 or that the Grand Lodge was a beneficiary of their policies. The certificates of insurance also lulled some Masons into believing they had a $10,000 insurance policy with a single beneficiary, when in fact they were insured for $25,000 with the Grand Lodge as a partial beneficiary.

A jury convicted Souder, Chambers, and Elliott of the nine counts of mail fraud charged in the first indictment. The district court heard argument on the Defendants' joint post-verdict motion for judgment of acquittal and found the

13

government's evidence insufficient as a matter of law to sustain the verdicts. Accordingly, the district court granted the Defendants' motion and also conditionally granted a new trial.

## II.

### A.

The government first contends that the district court erred in entering judgment of acquittal on the mail fraud counts. We agree and reverse.

We review a district court's grant of a judgment of acquittal de novo, assessing whether, taking the evidence in the light most favorable to the government, "a rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt." United States v. Singh, 518 F.3d 236, 246 (4th Cir. 2008). A conviction for mail fraud under 18 U.S.C. § 1341 requires the government to prove "the existence of a scheme to defraud, and [] the use of the mails for the purpose of executing the scheme." United States v. Godwin, 272 F.3d 659, 666 (4th Cir. 2001). The government must also prove that each defendant acted with specific intent to defraud. Id. A scheme or artifice to defraud must employ some material misrepresentation or concealment of fact. See, e.g., United States v. Harvey, 532 F.3d 326, 333 (4th Cir. 2008).

14

Common-law fraud arises not just from a failure to disclose material information pursuant to a fiduciary, statutory, or other legal duty, but " 'includes acts taken to conceal, create a false impression, mislead, or otherwise deceive in order to prevent the other party from acquiring material information.' " United States v. Gray, 405 F.3d 227, 235 (4th Cir. 2005) (quoting United States v. Colton, 231 F.3d 890, 898 (4th Cir. 2000)).

The government contends the evidence of the Defendants' conduct with respect to the Grand Lodge insurance program was sufficient to sustain the mail fraud convictions. In particular, the government points to evidence tending to show that the Defendants (1) failed to disclose at the May 25, 2002 meeting that the supplemental insurance program then being contemplated would include policies providing $25,000 in insurance coverage with a partial benefit to the Grand Lodge; (2) continued to misrepresent the terms of the program in subsequent discussions with Masons, including members of the Grand Lodge's leadership; (3) directed ALGA agents to omit the policy amounts and beneficiary designations on applications submitted by participating Masons; (4) created certificates of insurance for mailing to participating Masons that did not accurately represent the actual policy amounts and failed to

15

disclose that the Grand Lodge would be a partial beneficiary on policies issued for $25,000; and (5) deprived both the Grand Lodge and individual Masons of the money used to fund the premium payments for the program.

As they did at trial, the Defendants contend that the government improperly "create[d] a crime" from the Defendants' mismanaged efforts to create an insurance program designed to benefit both the Grand Lodge and its members. Appellee's Br. 3. The Defendants maintain that the $25,000 policies that are the crux of the government's case had not yet been approved by American Heritage at the time of the May 25, 2002 meeting and, thus, the Defendants could not have materially misrepresented the terms of those policies. Although the Defendants do not dispute that certificates of insurance were prepared and mailed to participating Masons, they contend that the documents served only to provide Masons with proof that they were insured and that their named beneficiary would receive a $10,000 benefit. According to the Defendants, the Masons were otherwise aware of the full scope of the insurance program implemented by the Grand Lodge.

## B.

In granting the motion for judgment of acquittal, the district court concluded that "the Government failed to present

substantial evidence, or any evidence for that matter, of any material misrepresentation or omission made by Defendants with regard to or in furtherance of a scheme to defraud the Grand Lodge and its members." J.A. 2859. Viewing the evidence in the light most favorable to the government, we find the district court's conclusion at odds with the record.

The district court first concluded that statements made by the Defendants at the May 25, 2002 meeting were not misrepresentations as to the existence of a $25,000 policy that would benefit the Grand Lodge because "negotiations between Atlanta Life and American Heritage [regarding issuance of $25,000 policies] were not complete until June 4, 2002." Id. 2833. On this issue, however, the district court failed to credit the government's evidence tending to show that the Defendants' intent from the inception of the program was, at least in part, to benefit the Grand Lodge directly. To that end, the evidence showed that Souder pitched the program to Jayne Silven on May 16 or 17, 2002 as one where the Grand Lodge would own any policies issued and would be a partial beneficiary on certain policies. This discussion predated the May 25, 2002 meeting at which Chambers and Souder denied that the Grand Lodge stood to benefit from the program. Considering the evidence as a whole and drawing all inferences in favor of the government, a

17

rational jury could conclude that Chambers's and Souder's failures to inform the Masons at the May 25 meeting of the specifics of the insurance program then being contemplated, coupled with Chambers's statements that the Grand Lodge would not benefit from the program, were material misrepresentations.

Further, the jury heard evidence that Chambers provided a summary to the Executive Committee of the Eastern Star on June 15, 2002--after American Heritage had agreed to underwrite the $25,000 split benefit policies--where he again failed to mention that the Grand Lodge stood to benefit from the program. The jury heard additional evidence that Chambers and Elliott made written representations to Masons at the Grand Lodge annual meeting in October 2003 that the program was a success and provided a $10,000 benefit, but again omitted any reference to the $25,000 policies for which the Grand Lodge was a beneficiary. Finally, several members of the Grand Lodge executive committee testified that they were unaware that the Grand Lodge was a beneficiary on issued $25,000 policies.

Moreover, even if we were to accept the district court's view that the Defendants' failure to discuss the details of the proposed $25,000 policy program at the May 25 meeting was not a material omission of fact because such a program had not yet been finalized, the government presented other evidence that a

rational jury could have accepted as sufficient to convict on the mail fraud counts. In particular, the district court failed to credit the government's evidence tending to show that the Defendants directed ALGA agents to omit the face amount of the policy and the identity of the beneficiary on applications submitted by Masons, and that, at least in some instances, policies were issued that insured Masons for $25,000 and named the Grand Lodge as a partial beneficiary without the knowledge of the insured.

The Defendants posit an innocent explanation for this state of affairs, contending that the face amount of the policy could not be established at the time of the application, because the ultimate amount of coverage depended on underwriting variables related to each insured. That explanation, however, does not fully address the government's contention that Masons were never told that they could be approved for $25,000 in insurance coverage, or that a portion of that coverage would inure to the benefit of the Grand Lodge. Regardless, in apparently crediting the Defendants' explanations for their actions, the district court failed to recognize that the jury was free to assess the evidence and to resolve any contradictions against the Defendants.

As for the certificates of insurance that the Defendants prepared, signed, and mailed to individual Masons, a rational jury could have concluded that they were created for deceptive purposes, contrary to the district court's conclusion and the Defendants' argument on appeal. As we have already noted, the certificates were inaccurate in key respects, insofar as they omitted the face amount of the policies for those Masons who had been insured for $25,000 and did not reflect that the Grand Lodge was a beneficiary of those policies. We are also satisfied that a rational jury could conclude that these omissions were material. Indeed, the government presented testimony from a number of Masons that they never intended to purchase $25,000 policies that would benefit the Grand Lodge and that the certificates misled them about the true nature of the transactions.

The district court also concluded that the Riders signed by each Mason sufficiently alerted those applying for insurance that they might qualify for a $25,000 policy. But while it is true that each Rider included a generic statement that the minimum face amount of the policy to which it could be attached was $25,000, the evidence also showed that (1) the Riders were attached to all applications, only some of which resulted in the issuance of $25,000 policies, and (2) the Riders did not alert

20

Masons that the Grand Lodge would be a beneficiary on at least some of the policies. Thus, a rational jury could have concluded that the Riders did not provide the type of notice that the district court ascribed to them.

The district court also determined that "the Government presented no evidence to support a jury finding that any of the Defendants acted with the specific intent to defraud the Grand Lodge and its members of something of value." Id. 2860. Here again, we find the district court failed to give proper weight to the government's evidence tending to show that (1) the Defendants had reached an agreement in principle with American Heritage--before the May 25, 2002 meeting--to offer Masons $25,000 policies that would partially benefit the Grand Lodge; (2) the Defendants' agents intentionally procured the signatures of Masons on insurance applications without including the face amount of the policy or the identity of the Grand Lodge as a beneficiary; (3) some applications were processed so as to provide Masons who qualified with $25,000 in coverage and name the Grand Lodge as a partial beneficiary without the insured's knowledge or consent; and (4) Masons within the Grand Lodge's leadership, as well as rank and file members, were unaware that the program was issuing $25,000 policies that in part benefitted the Grand Lodge. Moreover, the government easily satisfied its

21

burden to show that the Defendants wrongfully deprived the Grand Lodge and its members of something of value in the form of the premium payments tendered by these parties.

In sum, viewing the evidence in the light most favorable to the government, "a reasonable jury could conclude that the defendants engaged in a scheme to defraud, and that they carried it out by use of the mails," Godwin, 272 F.3d at 667. Accordingly, we reverse the district court's grant of the Defendants' post-verdict motion for judgment of acquittal.


III.

The government next asserts that the district court erred in conditionally granting a new trial. Applying the more deferential standard of review applicable to this issue, we affirm.

We review a district court's grant of a new trial for abuse of discretion. Singh, 518 F.3d at 249. The district court may order a new trial if the evidence weighs so heavily against the verdict that to deny a new trial would be contrary to the "interest of justice." See Fed. R. Crim. P. 33(a); United States v. Campbell, 977 F.2d 854, 860 (4th Cir. 1992).

Although the decision to grant a new trial lies within the discretion of the district court, respect for the role of the

jury demands that a court exercise this discretion "sparingly," United States v. Smith, 451 F.3d 209, 217 (4th Cir. 2006), i.e., only when "the evidence weighs so heavily against the verdict that it would be unjust to enter judgment." United States v. Arrington, 757 F.2d 1484, 1485 (4th Cir. 1985). Nevertheless, in contrast to the limitations imposed on a trial court when considering a motion for judgment of acquittal, the court may consider the credibility of witnesses and need not view the evidence in the light most favorable to the government in determining whether to grant a new trial. Campbell, 977 F.2d at 860.

At the outset, we reject the government's contention that the district court improperly granted a new trial for the same reason it erroneously granted a judgment of acquittal: that the evidence was insufficient to support the verdicts. There is of course a difference in degree and kind between a trial court's decision to grant a motion for judgment of acquittal and its decision to award a new trial. In assessing the former, the trial court must find that the evidence was legally insufficient to support the conviction (i.e., that no rational jury could have voted to convict on the government's evidence); as to the latter, the trial court may grant relief if it determines that the evidence--even if legally sufficient to convict--weighs so

23

heavily against the verdict that it would be unjust to enter judgment. See id.

As a result, our cases hold that if the evidence is legally sufficient to affirm a criminal conviction, a trial court abuses its discretion when, without further explanation, it grants "a new trial based on its finding that the evidence was insufficient to support the verdict." United States v. Wood, 340 F. App'x 910, 911 (4th Cir. 2009). In this vein, the government argues here that "the same factors that the judge considered in granting the judgment of acquittal apparently provided the basis for its grant of a new trial," and thus "the fundamental error that tainted the district court's decision to grant a judgment of acquittal also tainted its decision to grant a new trial." Appellant's Br. 56-57.

Pressing its point further, the government analogizes the instant case to Singh and United States v. Wilson, 118 F.3d 228 (4th Cir. 1997). In Singh, however, we reversed a judgment of acquittal and the grant of a new trial for a corporate defendant, finding with respect to the latter that "the evidence . . . did not at all weigh heavily against the verdict . . . but was wholly sufficient to support it." 518 F.3d at 250. The district court's error, we concluded, rested on its erroneous determination that the criminal conduct of the defendant's agent

24

or employee could not be imputed to the defendant. Id. at 251. This error, we held, tainted the district court's analysis with respect to the judgment of acquittal and the grant of a new trial. Id. In this case, however, the district court did not commit the type of foundational legal error that compelled us to reverse in Singh. Rather, "we interpret the district court's ruling as a finding that the verdict was against the cumulative weight of the evidence[, which] is a proper ground upon which to grant a new trial." Campbell, 977 F.2d at 860 n.6.

In Wilson, we reversed a judgment of acquittal and affirmed a denial of a motion for a new trial. We held there that because "abundant evidence support[ed] the jury's verdict," the district court did not abuse its discretion in denying a motion for a new trial based on the weight of the evidence. 118 F.3d at 237. Contrary to the government's suggestion, however, Wilson does not hold that a trial court is foreclosed from granting a motion for a new trial in every case where the evidence is legally sufficient to support a jury's verdict. And while Wilson teaches that "a district court should exercise its discretion to grant a new trial 'sparingly' and that the district court should grant a new trial based on the weight of the evidence 'only when the evidence weighs heavily against the verdict,' " id., we evaluate such a ruling against the backdrop

25

of the district court's "broad power" to independently weigh the evidence when considering such a motion, as well as the deferential standard of review we must apply to that decision, Arrington, 757 F.2d at 1485.

Although the district court's memorandum opinion could have been clearer on the point, we are satisfied that the able and experienced trial judge presiding over this case understood the extent, and limits, of his discretion in considering the motion for a new trial. And while the trial court erred by drawing inferences unfavorable to the government with respect to the Defendants' motion for acquittal, it was under no such constraint when considering whether the verdicts were against the cumulative weight of the evidence.

In that regard, the district court noted that only a few hundred of the over 18,000 members of the Grand Lodge were present at the May 25, 2002 meeting where, according to the government, the Defendants first planted the seeds of deception with respect to the supplemental insurance program. Indeed, the vast majority of the Masons received information about the program through regional and local lodge meetings held around the state at which the Defendants were not present.

Moreover, three Masons called by the government testified that they understood the program offered $25,000 policies or

26

that those policies had a split benefit provision where some portion of the death benefit would be paid to the Grand Lodge. The Defendants also called four additional Masons, who testified that they too were aware of the $25,000 split benefit policies and understood that the Grand Lodge would receive some portion of the death benefit from the policies. On the strength of this evidence, the district court, now considering the record pursuant to Rule 33, opined that the government's "evidence with regard to material omissions was based on the recollections of Masons who attended meetings regarding the [insurance program], some of whom testified to having knowledge of the very facts that the Government contends the Defendants materially omitted or concealed [from Grand Lodge members]." J.A. 2859-60.

The testimony of government witness James Lightfoot provides a stark example of the confusion endemic among the Masons regarding the specifics of the insurance program. Lightfoot attended the May 25, 2002 meeting that the government portrays as the genesis of the scheme to defraud. Lightfoot, however, insisted at trial that Chambers told those present that the program would include a split beneficiary arrangement to partially benefit the Grand Lodge, but that Chambers backpedaled on this aspect of the program after several Masons voiced objections. Lightfoot did not recall, however, hearing Chambers

27

tell those assembled that the Grand Lodge would own the policies.

The government's evidence at trial included a transcript of the 25 May meeting, which was produced from an audio recording. Tellingly, the transcript does not corroborate Lightfoot's view as to what Chambers purportedly said regarding the split beneficiary arrangement, although it confirms what Chambers said (and Lightfoot could not remember) about the ownership of the policies. Our point here is this: We cannot say the district court abused its discretion when--in considering whether the verdicts were against the cumulative weight of the evidence--it questioned precisely what Masons were told, or remembered some six years later, regarding the particulars of the supplemental insurance program.

The district court also placed great weight on the Riders attached to each insurance application, which contained a declaration that the minimum face amount of the policy to which they may be attached was $25,000. The district court found that the Riders supported the view "that there was widespread knowledge among the members of the Grand Lodge's offering of $25,000 policies." Id. 2836. While the district court erred in drawing such an inference on the motion for judgment of

28

acquittal, it was entitled to weigh this evidence as it saw fit when determining whether to grant a new trial.

Further, the record is unclear as to precisely which policies were available to Masons, as opposed to merely contemplated or agreed upon in principle, at the time of the May 25, 2002 meeting. The district court concluded that only $10,000 policies were available for issuance at that time and thus the Defendants could not have misrepresented any facts at the May 25 meeting related to $25,000 policies that had not yet been approved. Here again, we can discern no abuse of discretion in such a determination by the district court.

The district court further accepted as credible the Defendants' explanation that agents were instructed to leave blank the "amount of insurance" field on a Mason's application because the underwriters could determine the actual amount of coverage only upon review of a completed application. Regarding the certificates of insurance issued by the Grand Lodge that the government argued served to perpetuate the fraud, the district court concluded instead that Chambers and Elliott did not specifically intend to defraud their fellow Masons, but rather asked ALGA to help them respond to the requests of individual Masons by creating a document that would "serve as proof to the members of their death's benefit [sic]" and "reflect the

29

relationship between the Grand Lodge and its members." Id. 2839. In that regard, the district court found "that the information contained in the certificates is correct and accurately represents the information that had been conveyed to the members" regarding the Grand Lodge's ownership of the policies, the Mason's $10,000 death benefit, the Mason's designated beneficiary, and the Mason's monthly premiums. Id. 2839-40. The government understandably infers something entirely different from this evidence, but it bears repeating that on a motion for a new trial, it is the district court's prerogative to draw its own inferences, Campbell, 972 F.2d at 860.[6]

Finally, Chambers and Souder testified at trial and denied any intent to conceal the particulars of the insurance program or to defraud the Grand Lodge or its members. Rather, they contended their intent, even if poorly executed, was "to create an insurance program that would inure to the benefit, and not

---

[6] The government criticizes the district court for not providing a point-by-point rebuttal of its evidence regarding the alleged scheme or artifice to defraud. Perhaps so, but we are unaware of any law requiring the level of detail that the government insists on. We are satisfied that the district court gave sufficient and careful consideration to all of the evidence in this case before determining that the verdicts were against the greater weight of that evidence.

the deprivation, of the Grand Lodge and its members." J.A. 2843. Although not an express point of emphasis in the district court's memorandum opinion, it seems clear that the district court chose to credit the Defendants' innocent explanations for their actions over the sinister interpretation posited by the government. And while the government would wish it otherwise, it is precisely this kind of credibility determination that is the trial court's call to make on a motion for a new trial.

At bottom, in urging reversal of the district court as to this issue, the government would have us ignore the standard we are bound to apply on appeal. While reasonable judges might view this record differently if allowed to consider it in the first instance, and we have nothing but the utmost respect for the jury that considered this difficult matter over thirteen days, we cannot say that the district court abused its discretion in holding that the evidence weighed so heavily against the verdicts so as to warrant a new trial. See, e.g., Evans v. Eaton Corp. Long Term Disability Plan, 514 F.3d 315, 322 (4th Cir. 2008) ("At its immovable core, the abuse of discretion standard requires a reviewing court to show enough deference to a primary decision-maker's judgment that the court does not reverse merely because it would have come to a different result in the first instance.").

31

IV.

For the foregoing reasons, we reverse the district court's judgment of acquittal, affirm the conditional grant of a new trial, and remand to the district court for further proceedings.

<u>AFFIRMED IN PART,</u>
<u>REVERSED IN PART,</u>
<u>AND REMANDED</u>

32