# United States Court of Appeals

## For the First Circuit

No. 07-2437

UNITED STATES OF AMERICA,

Appellee,

v.

ANTHONY D. MAREK,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Richard G. Stearns, U.S. District Judge]

Before

Boudin, Selya, and Dyk,[*]
Circuit Judges.

John J.E. Markham, II for the appellant.
Kelly Begg Lawrence Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief, for the appellee.

November 26, 2008

---

[*]   Of the Federal Circuit, sitting by designation.

**DYK**, **Circuit Judge**.  Anthony D. Marek ("Marek") appeals from his conviction, under 26 U.S.C. § 7212(a), for corruptly endeavoring to obstruct or impede the due administration of the Internal Revenue Code.  Because we conclude that the evidence was sufficient to support Marek's conviction, we affirm.

## I.

We recite the facts in the light most favorable to the verdict.  United States v. McFarland, 445 F.3d 29, 31 (1st Cir. 2006).[1]

## A.

In the fall of 1994, the Internal Revenue Service ("IRS") began a routine audit of the corporate taxes of Stoneham Towing, Inc. for tax year 1992. Stoneham Towing was an S-corporation owned at the time by Stephen Mazzola, and operated by Stephen and his siblings Joseph Mazzola and Christina Svendsen.  The audit ultimately was broadened to encompass the tax years 1992-1994 and the personal income taxes of Stephen, Joseph, Christina, their father Sebastian, and other employees and the related business of

---

[1]At trial Marek chose not to introduce any evidence. In his briefs on appeal, Marek refers to documents and other items that were not introduced into evidence.  After his conviction and with the services of a new attorney, Marek moved for a new trial and to introduce new evidence under Federal Rule of Criminal Procedure 33(a).  The district court denied this motion, and the motion is not at issue on this appeal.  Under these circumstances we will not consider the affidavit Marek submitted to the district court or any other material submitted in support of the Rule 33(a) motion.  We limit our review to the evidence in the record at trial.

Bodyworks Company, Inc. ("Bodyworks").  Stoneham Towing (a term which we use to include Bodyworks) was a customer of Marek, a local Snap-On Tools distributor; Marek was not among those audited, and it is not clear from the record whether Marek's business was organized as a corporation, partnership, or sole proprietorship.

Stoneham Towing used an independent service called "Paychex" to administer the payroll of the business.  Paychex was responsible for, among other things, issuing paychecks to employees from the payroll account, creating W-2s, withholding employee income tax, maintaining payroll records and preparing quarterly employment tax returns (IRS Form 941) based on information provided by Stoneham Towing.

At some time before March 1995, during the course of the audit, the IRS auditor noticed that there were a number of Stoneham Towing checks made out to employees that were not drawn from the payroll account, with the result that Paychex did not treat them as employee compensation for IRS reporting and withholding.  The IRS auditor submitted information document requests to Stoneham Towing on March 7, 1995, June 20, 1995, and August 15, 1996, seeking substantiation that these checks were business expenses.  Some of these checks had "contract labor" on the memo line of the check, suggesting that the check reflected payments for contract labor work.  Under 26 U.S.C. §§ 6041, 6041A, any such payments over $600 for the year must be reported to the IRS on IRS Form 1099.  See IRS

Instruction to Form 1099.

In an interview with Stephen Mazzola in July 1996, the IRS auditor asked why Stoneham Towing did not file the required IRS Form 1099 for contract labor. Stephen Mazzola told the auditor that the memo lines were incorrect; that the checks did not reflect payments to his employees; and that the checks had been cashed by the employees to make cash purchases of business items from vendors who refused to accept checks from Stoneham Towing because of Stoneham Towing's poor credit.

In order to enable Stoneham Towing to respond to the IRS information request, around June 1997 Stephen Mazzola requested that Marek and other vendors prepare backdated invoices purporting to record cash purchases for the tax years in question. It is these invoices that lie at the heart of the criminal action against Marek.

Stoneham Towing responded to the auditor's information document requests around July 1997 by submitting the backdated vendor invoices. Neither the invoices themselves nor any other written or oral communication with the auditor indicated that the invoices were backdated re-creations, rather than contemporaneous documents; the auditor testified that she would have sought additional third-party verification of the invoices if she had known they were recreations.

Based on similarities in the dates and amounts of the

- 4 -

invoices and checks in question, the auditor concluded that the non-payroll account checks were properly used to pay vendors, rather than employees. The audits closed in late 1997 and early 1998.

The criminal investigation that ultimately resulted in Marek's conviction began in April 1998, shortly after the audit closed, when Joseph Mazzola contacted IRS agents and alleged that the invoices submitted during the audit were false, and part of an effort to conceal a scheme to, inter alia, skim money from the company and pay employees "under the table" to help the employees evade income taxes and to enable the company to evade payroll and other employment taxes.

Two counts were returned in the indictment against Marek: a "Klein Conspiracy" to defraud the United States by obstructing the IRS, see United States v. Klein, 247 F.2d 908 (2d Cir. 1957), and a separate count of "corruptly . . . endeavor[ing] to obstruct or impede[] the due administration of [the Internal Revenue Code]," the so-called "omnibus provision," 26 U.S.C. § 7212(a). The Klein Conspiracy count focused on Marek's alleged participation in the scheme to manipulate and conceal payments to employees. The omnibus count focused on the submission of the false invoices to the IRS. Marek waived the right to a jury trial, and his case was tried to the court together with five other defendants connected to Stoneham Towing and charged with related offenses.

At trial Marek stipulated that he created the invoices in question. The evidence established that Marek supplied these invoices to Stephen Mazzola who in turn supplied them to the IRS auditor. The evidence also showed that the invoices prepared by Marek and submitted to the IRS were not originals created at the time of the purported sales recorded therein, but were created by Marek in response to Stephen Mazzola's request. As discussed below, evidence was presented bearing on the falsity of the invoices and culpable intent.

After the presentation of the government's evidence, Marek moved for an acquittal under Federal Rule of Criminal Procedure 29 asserting that the evidence was insufficient under both counts. The district court granted the motion with respect to the Klein Conspiracy count. However, the district court denied the motion with respect to the count of corruptly endeavoring to obstruct or impede the due administration of the Internal Revenue Code. The district court ultimately found Marek guilty under this omnibus count. The district court concluded both that the invoices were false, and that Marek had the intent required by the statute. With respect to intent, the district court found that Marek either knew of or was willfully blind to the fact that the invoices would be presented to the IRS as part of an audit of Stoneham Towing. Marek was therefore guilty of the offense charged under § 7212.

- 6 -

On August 17, 2007, the district court sentenced Marek to one year of probation, the first six months of which would be under home detention without electronic monitoring, and a $3,000 fine. Marek timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291.

**II.**

The sole issue on appeal is whether there is sufficient evidence to support Marek's conviction under 26 U.S.C. § 7212(a). We evaluate the evidence in the light most favorable to the government, accepting all reasonable inferences supporting the verdict, and determine whether "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" McFarland, 445 F.3d at 31 (quoting United States v. Grace, 367 F.3d 29, 34 (1st Cir. 2004)).

The interpretation of 26 U.S.C. § 7212(a) is a matter of first impression for this court. See United States v. Brennick, 134 F.3d 10, 12-13 (1st Cir. 1998) (discussing sentencing guidelines but not the elements of the crime). However, the plain language of the statute supports an interpretation requiring proof that the defendant 1) corruptly, 2) endeavored, 3) to obstruct or impede the due administration of the Internal Revenue laws. See 26 U.S.C. § 7212(a); see, e.g., United States v. Wilson, 118 F.3d 228, 234 (4th Cir. 1997). Supplying false documents knowing that the documents will be used to deceive the IRS during an audit is a

quintessential violation of the statute.  See Wilson, 118 F.3d at 234-36 (finding violation based on false backdated notes created by an attorney to support a client's efforts to evade paying tax owed during an IRS audit); see also United States v. Bowman, 173 F.3d 595, 599-600 (6th Cir. 1999) (holding that awareness of an audit is not required where false information returns about creditors were submitted to the IRS to harass and annoy creditors); United States v. Popkin, 943 F.2d 1535, 1540-41 (11th Cir. 1991)(finding violation based on shell corporation created by an attorney to help a client hide money from the IRS).

Marek claims that 1) there was not sufficient evidence to support finding beyond a reasonable doubt that the invoices were false, and 2) even assuming the invoices were false, there was not sufficient evidence to support finding beyond a reasonable doubt that Marek knew that the invoices would be used to deceive the IRS in an audit.

**A.**

The evidence strongly supports the district court's finding of falsity.  As the district court found, the evidence was uncontroverted that Marek "did . . . 'recreate' invoices that allegedly represented cash purchases."  An expert witness testified that none of the documents of either Snap-On Tools or Stoneham Towing included any support for the alleged cash transactions represented in the invoices submitted to the auditor.  There were as many as 70 boxes of documents from Stoneham Towing alone that

- 8 -

were reviewed for corroboration of the alleged cash transactions. Marek concedes that "in the records produced by Marek, there were no ledgers showing cash receipts . . . ." (Appellant's Reply Br. 13.) The district court found, and Marek does not dispute, that none of the other copious business records in this case included any mention of, or support for, the cash purchases. There was also testimony by former employees that at least some of the items on the invoices either were never purchased or were purchased before 1992.

Several of the invoices were made out to an individual who was not even employed by Stoneham Towing at the time of the dates on the invoices. Former employees who received cash payments from Stoneham Towing testified that these cash payments represented compensation for their regular work, and that these payments were not reported on their Paychex paycheck stubs or on their W-2s.

Joseph Mazzola testified that the checks questioned by the auditor were not used to purchase from vendors, but were instead used to pay employees, and that the Snap-On Tools invoices presented to the auditor were false. He also testified that Stephen Mazzola regularly directed employees to cash checks for cash payments to employees on weekly paydays each Friday. Joseph Mazzola described his method for keeping a second set of books to record those cash payments to the employees.

Also in evidence were a series of checks and testimony showing that Marek did not always demand cash from Stoneham Towing,

contrary to the explanation Stephen Mazzola offered to the auditor. There is ample evidence to establish falsity.

**B.**

On the issue of intent, the evidence that the invoices were false (and that Marek prepared them) in and of itself supports the district court's finding that Marek was aware of their falsity and that they would be used for an improper purpose. Marek argues, however, that, while the evidence might show that he was aware that the invoices were to be used for an improper purpose, the evidence did not support a finding that he was aware that they were to be used to corruptly influence the IRS, a required element of the offense.

We start with the premise that IRS audits of businesses routinely seek invoices to support the existence of legitimate business expenses. The IRS provides advice on recordkeeping to small businesses, including keeping invoices of receipts, purchases, and expenses. See, e.g., I.R.S. Publication 583, "Starting a Business and Keeping Records" (Nov. 1995). The IRS advises that "records must support the income, expenses, and credits you report. . . . You must keep your business records available at all times for inspection by the IRS. If the IRS examines any of your tax returns, you may be asked to explain the items reported." Id. at 12; see also I.R.S. Publication 552, "Recordkeeping for Individuals" (Nov. 1994).

It is also well known that taxpayers sometimes attempt to

deceive the IRS by submitting false invoices or other supporting documentation.  The use of false invoices is so paradigmatic of tax fraud that the Supreme Court listed it among the classic indicia from which a willful intent to defeat or evade taxes might be inferred.  Spies v. United States, 317 U.S. 492, 499 (1943).[2]

The district court here noted the "innate suspiciousness of the circumstances" involved with creating false invoices. General knowledge in the community can be strong circumstantial evidence of the defendant's knowledge.  See McGunnigal v. United States, 151 F.2d 162, 166 (1st Cir. 1945)(general knowledge in the community may support a finding of defendant's knowledge).  Thus, an experienced businessman, such as Marek, would likely know that false invoices are often used to deceive the IRS and have no legitimate purpose, and suspect that they might be used in an IRS audit.

We need not decide whether such evidence alone would be sufficient to convict because the district court did not find that the mere knowing creation of false invoices was itself sufficient to satisfy the intent requirement.  Rather the district court found that the "innate suspiciousness" coupled with Marek's knowledge of

---

[2] For other examples of the use of false invoices in avoiding taxes, see United States v. Shellef, 507 F.3d 82, 90 (2d Cir. 2007); Zack v. Comm'r, 291 F.3d 407, 410 (6th Cir. 2002); In re Grothues, 226 F.3d 334, 339 (5th Cir. 2000); United States v. Chmielewski, 218 F.3d 840, 841-42 (8th Cir. 2000); United States v. Powell, 124 F.3d 655, 657-660 (5th Cir. 1997); United States v. West, 58 F.3d 133, 137 (5th Cir. 1995); United States v. Gurary, 860 F.2d 521, 523 (2d Cir. 1988).

the IRS audit was sufficient.

There was, to be sure, no direct testimony that Marek was aware of the audit; however, "purely circumstantial evidence can support an inference of knowledge." United States v. Lachman, 521 F.3d 12, 17 (1st Cir. 2008); see United States v. Mousli, 511 F.3d 7, 16 (1st Cir. 2007); see also Desert Palace, Inc. v. Costa, 539 U.S. 90, 100 (2003) ("[W]e have never questioned the sufficiency of circumstantial evidence in support of a criminal conviction . . . .").

The district court found that Marek knew about the IRS audit at the time he created the false invoices based on testimony by Flood. Flood, another vendor involved in creating false invoices, testified that the audit was widely known among the circle of friends that included Marek; that Marek was friendly with Stephen Mazzola; and that Stephen Mazzola had told Flood about the audit when he asked him to make false invoices. The district court inferred that Stephen Mazzola and likely others had also told Marek about the audit.

Contrary to Marek's contention, the testimony supports the district court's findings. When asked when he had heard about the IRS audit, Flood stated that he couldn't recall but that "[i]t was all over town. I mean, Stephen [Mazzola] had said it himself."[3] The district court "credit[ed] [Flood's] testimony that

_____

[3] The full testimony is as follows:

- 12 -

the fact that the Mazzolas were being audited was widely known, if not in the community at large, as Mr. Flood testified, certainly it was known among the circle of friends of Stephen Mazzola of which Mr. Marek and [another vendor/defendant] were a part."

The evidence shows that Stephen Mazzola and Marek were close associates. Flood testified that he and Marek were not only business associates with Stephen Mazzola, but that Flood, Marek, and Stephen went on road trips to car shows together and spent time together on vacation with their families in Florida.[4]

Q: Prior to that time that evening, had you heard about the IRS audit?
A: Yes.
Q: When?
A: I can't recall the time.
Q: Do you recall how you heard about the audit?
A: It was all over town. I mean, Stephen [Mazzola] had said it himself.
Q: Stephen had said it to whom?
A: To me.
Q: Do you recall when?
A: No, I don't recall.
Q: Do you recall where?
A: In his office.

[4] Flood testified that he and Stephen Mazzola went with groups on road trips to a number of car shows. Flood testified that "Marek went to a few of them with us." Flood also testified about spending time in Florida with Stephen Mazzola and Marek while on vacation:

A: We were down in Florida, and Stephen [Mazzola] and I --
Q: Can you tell us who was down in Florida when you say "we"?
A: The group of us that went to Florida on vacation. We met with . . . Marek, his wife and family, and my wife, my brother-in-law Richard and his wife, Stephen [Mazzola] and his wife.

- 13 -

Flood additionally testified that Stephen Mazzola told Flood that the purpose of creating the false invoices was for an IRS audit,[5] and that Marek had also agreed to help create invoices, supporting an inference that Marek was also told.[6]

_____

[5] Flood testified:

Q:   What did you understand was the purpose for your making up those fake slips that night?
A:   To help him [Stephen Mazzola] with an IRS audit.
Q:   How did you get that understanding?
A:   Because that's what he [Stephen Mazzola] said.

On cross examination, Flood instead testified that Stephen Mazzola only said he needed the invoices "for his accountant"; Flood specifically testified that Stephen Mazzola did not mention that the false invoices were for use in the IRS audit. However, on review we must view the evidence in the light most favorable to the government; the district court was within its discretion to resolve conflicting testimony on the contents of this conversation in favor of the government.

[6] Flood testified:
Q:   When you arrived over there at Stephen's office, did Stephen talk to you?
A:   (Witness nods.)
Q:   What did he say to you?
A:   He asked me what I wanted for pizza, and then we sat down, and he started telling me what to write on these slips.
*  *  *
Q:   Did he discuss with you whether other people were writing slips?
A:   Yes.
*  *  *
Q:   What did he tell you?
A:   He told me that a few of the other guys were writing out slips also.
*  *  *
Q:   What do you recall him saying?  Who else did he tell you?
A:   . . . Marek and James Konaxis.
Q:   And what did he tell you about their making slips?
A:   He didn't say they actually had.  He said he was going to get them to make slips.

- 14 -

There was also testimony that Flood, Marek and others were seen preparing documents. Richard McDonough, a friend of Stephen Mazzola's, testified that he came by Stephen Mazzola's place of business one afternoon after business hours and saw Marek, Flood, and another co-conspirator who submitted false invoices sitting together with Stephen in Stephen's office, each with "bills of sales or a book that you would write parts up for" in front of them. This itself suggested the likelihood of discussion about the purpose of the exercise.

At a minimum, the close association of Marek and Stephen Mazzola; the fact that Stephen Mazzola recruited Marek to prepare invoices; and Stephen Mazolla's disclosures to Flood about the audit and the planned use of the invoices support an inference that Stephen Mazolla provided similar information to Marek.[7] United States v. Azubike, 504 F.3d 30, 37 (1st Cir. 2007)(holding that a jury could infer that the defendant knew that a briefcase contained narcotics because of the close association between the defendant and others who likely did know the contents of the briefcase);

---

[7] The district court found it unlikely that "what Stephen Mazzola confided in a lesser friend [Flood] he would not have also told his better friends [Marek]." Although the peripheral finding that Flood was the lesser friend and Marek the better friend is, at best, sparsely supported on the record, any such factual error would be harmless, as the evidence that both Flood and Marek had a close relationship with Stephen Mazzola is substantial, and such evidence supports the district court's inference of Marek's knowledge of the audit.

United States v. Ortiz, 966 F.2d 707, 712-14 (1st Cir. 1992).[8]

Appellant argues that "there are a myriad of other explanations" for why Marek would create false invoices, citing as an example a hypothetical effort to deceive the Mazzola company accountant about whether "someone like Joseph Mazzola had been stealing from the company." But the district court found that such alternative explanations were not credible, and there is no basis for rejecting this finding. The absence of a credible alternative possible explanation for Marek's creation of the false invoices also supports the district court's guilty verdict.[9]

Marek argues that "[Stephen] Mazzola had left Marek with

---

[8] See also United States v. Huezo, No. 107-0031-CR, 2008 WL 4553150 (2d Cir. 2008)(knowledge of a money laundering scheme can be inferred despite complete absence of direct evidence the defendant was told about the scheme because the close relationship between defendant and the money launderers and defendant's participation in the scheme are circumstantial evidence of knowledge); see also United States v. Kaplan, 490 F.3d 110, 120 (2d Cir. 2007)("[E]vidence regarding the knowledge of individuals other than the defendant should be admitted only if there is some other evidence in the record—concerning, for example, the nature of the fraud or the relationship of the parties—from which to conclude that the defendant would have the same knowledge.")

[9] The district court also mentioned that "whatever doubt I may have had regarding the defendants' knowledge of the ultimate purpose of the invoices was dispelled by the very nature of the defense and the preposterous effort to prove that these invoices, in fact, reflected some aspect of reality." Of course, it is improper to consider mere argument, no matter how good or bad, as evidence in support of a conviction. See United States v. Riccio, 529 F.3d 40, 43-45 (1st Cir. 2008); see also 1st Cir. No. 3.08 Pattern Crim. Jury Instr.(1998)("Arguments and statements by lawyers are not evidence.") As the issue is not raised on appeal, we simply decline to consider this as "evidence" in the context of this challenge to the sufficiency of the evidence.

the impression that Mazzola and his accountant were trying to determine which of the Mazzolas, who were having family problems, had purchased which items. This is why, when Marek recreated the invoices in the manner described below, <u>they were made in the name of the actual Mazzola who Marek remembered selling the particular item to, rather than the name of either of the companies</u> [Stoneham Towing, Inc. or Bodyworks] as would have been more logical had Marek known that they were to support an audit of the company." (Appellant's Br. at 2-3.) However, the premise of this argument is incorrect. While some of the invoices were made out in the name of an officer or employee, many were made out expressly to Bodyworks, and many others included reference to "Stoneham" in parentheses together with the name of an employee.

We conclude that the inference that Marek knew about the audit was supported by the record. Thus, viewed in the light most favorable to the government and drawing all reasonable inferences in favor of the government, Marek's conviction is supported by sufficient evidence to support a finding that Marek was guilty of the offense.

**III.**

Marek's conviction is affirmed.

<u>Affirmed.</u>