# United States Court of Appeals
## For the First Circuit

No. 12-2229

UNITED STATES OF AMERICA,

Appellee,

v.

CATHERINE FLOYD,

Defendant, Appellant.

No. 12-2231

UNITED STATES OF AMERICA,

Appellee,

v.

WILLIAM SCOTT DION,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

Before

Howard, Selya and Stahl,

Circuit Judges.

Joan M. Griffin for appellant Floyd.
John M. Goggins for appellant Dion.
Damon William Taaffe, Attorney, Tax Division, U.S. Dep't of
Justice, with whom Kathryn Keneally, Assistant Attorney General,

Frank P. Cihlar, Chief, Criminal Appeals & Tax Enforcement Policy Section, Gregory Victor Davis, Attorney, Tax Division, and Carmen M. Ortiz, United States Attorney, were on brief, for appellee.

———————————————

January 7, 2014

———————————————

**SELYA, Circuit Judge.** Over two centuries ago, Benjamin Franklin famously wrote that "in this world nothing can be said to be certain, except death and taxes." Apparently unwilling to accept this conventional wisdom, defendants-appellants Catherine Floyd and William Scott Dion devised and participated in elaborate conspiracies to defraud the United States of tax revenues (or so the government alleges). A jury validated the government's allegations, and the defendants, ably represented, now pursue several claims of error. After careful consideration of this asseverational array, we affirm.

## I. OVERVIEW

This case began when a federal grand jury, sitting in the District of Massachusetts, indicted the defendants (who are husband and wife) and five others on a multiplicity of charges. The defendants and one such coconspirator, Charles Adams, were tried jointly.[1] Following a 17-day trial, a jury convicted the defendants of one count of conspiracy to defraud the United States of payroll taxes (count 1), one count of conspiracy to defraud the United States of income taxes (count 2), and one count each of endeavoring to obstruct and impede the Internal Revenue Service (IRS) (counts 4 and 5).

---

[1] These appeals were argued in conjunction with Adams's appeal (No. 12-2276). Because Adams's appeal raises a discrete set of issues, we will decide it in a separate opinion, to be issued shortly.

The government's case in chief centered on two schemes allegedly orchestrated by the defendants. The first involved the evasion of payroll taxes by third-party employers. We limn its mechanics.

Employers are required to withhold Social Security, Medicare, and federal income taxes from their employees' paychecks and to remit those payroll taxes to the IRS, along with matching contributions for Social Security and Medicare. See 26 U.S.C. § 3402. These remittances, and the forms that accompany them, have a dual purpose: they generate revenue for the Treasury and supply information about the tax liabilities of employers and employees. Notably, these withholding requirements generally apply only with respect to employees, not with respect to independent contractors.

It is trite but true that where there are taxes, there are individuals who seek to evade them. The government alleges (and the jury found) that the defendants and others set up and operated a series of entities to facilitate this kind of fraud.

One of these entities was Contract America — a company that Adams ran. Instead of paying its employees directly, a client firm would funnel money to Contract America, which then paid the client's employees (or those of them who agreed to participate in the fraud) under the table. Through this contrivance, both the client firm and the participating employees were able to hide from the IRS.

-4-

Tax evasion is a dangerous tango, and not all employees want to dance. The government alleges that the defendants complemented the services of Contract America by operating a front company (Talent Management) to work with employees who wanted to stay on the straight and narrow. A firm using this service would funnel money to Talent Management, which would comply with the withholding requirements before paying the affected employees. This made it look as if Talent Management was actually employing the workers and allowed the client firm to remain invisible.

The second scheme involved the provision of sub rosa "warehouse banking" services. In this operation, the defendants commingled their own funds and the funds of many clients in nominee bank accounts. The purpose of this commingling was to confound the IRS about the source of the funds.

The defendants executed the warehouse banking scheme through a company called Your Virtual Office (YVO), its successor Office Services, and related entities. Clients delivered funds to the defendants, who deposited the funds into a constellation of accounts that the defendants controlled. On request, the defendants would use the deposited funds to defray a client's expenses or to deliver cash. A software program would track the flow of funds.

Even after the defendants closed their warehouse banking operation, they urged a coconspirator (Gail Thorick) to continue

the business. Thorick did so, through a firm called Calico Management.

As a capstone to the indictment, the government charged the defendants with endeavoring to impede the IRS by concealing their ill-gotten gains. The nub of these charges is the government's contention that the defendants operated their warehouse banking scheme so as to obstruct the IRS's assessment of their personal tax liability.

## II. ANALYSIS

On appeal, the defendants argue that there was insufficient evidence to support their convictions; that certain evidence should have been suppressed; that they should not have been tried jointly with Adams; and that the IRS's failure to comply with the Federal Register Act should have engendered dismissal of counts 4 and 5. In addition, Dion alone challenges his sentence. We examine these assignments of error sequentially.

### A. Sufficiency of the Evidence.

"We review preserved objections to evidentiary sufficiency de novo." United States v. Gobbi, 471 F.3d 302, 308 (1st Cir. 2006). In conducting this tamisage, we "must canvass the evidence (direct and circumstantial) in the light most agreeable to the prosecution and decide whether that evidence, including all plausible inferences extractable therefrom, enables a rational factfinder to conclude beyond a reasonable doubt that the defendant

-6-

committed the charged crime." United States v. Ortiz de Jesus, 230 F.3d 1, 5 (1st Cir. 2000) (internal quotation marks omitted). We will uphold the jury's verdict as long as it "is supported by a plausible rendition of the record." United States v. Ortiz, 966 F.2d 707, 711 (1st Cir. 1992).

The defendants challenge the sufficiency of the evidence across the board. We proceed count by count.

1.  **Count 1: The Payroll Tax Conspiracy**.  Count 1 implicates 18 U.S.C. § 371, which criminalizes any conspiracy "to defraud the United States, or any agency thereof in any manner or for any purpose." To sustain a conviction under this statute, "the government must furnish sufficient evidence of three essential elements: an agreement, the unlawful objective of the agreement, and an overt act in furtherance of the agreement." United States v. Hurley, 957 F.2d 1, 4 (1st Cir. 1992). It also must establish "the knowing participation of each defendant in [the] conspiracy." United States v. Mubayyid, 658 F.3d 35, 57 (1st Cir. 2011). But the government need not show an explicit agreement. See United States v. Muñoz-Franco, 487 F.3d 25, 45-46 (1st Cir. 2007). Nor must it prove its case by direct evidence. See United States v. Frankhauser, 80 F.3d 641, 653 (1st Cir. 1996); United States v. David, 940 F.2d 722, 734 (1st Cir. 1991). A combination of direct and circumstantial evidence, or circumstantial evidence alone, may

suffice.  See United States v. Santiago, 83 F.3d 20, 23 (1st Cir. 1996).

The defendants concentrate their attack on the evidence of agreement and unlawful purpose.  Specifically, they assert that they did not operate Contract America; that they had no agreement with Adams to achieve Contract America's unlawful ends; and that the companies with which they were actively involved appropriately remitted payroll taxes.

The record contains several pieces of evidence that blunt the force of these assertions.  Each principal played a role in achieving the common purpose.  The evidence showed that Floyd structured the Contract America entity and served as its president, treasurer, and director.  She was also the signatory on Contract America's bank account and gave Adams's then wife Marie Jones (an unindicted coconspirator) a stamp bearing her (Floyd's) facsimile signature to use on outgoing Contract America checks.

Adams ran the day-to-day operations of Contract America (for a time, alongside Jones).  A post office box application listed him as a director of Talent Management.

Dion, who was denominated as a trustee of Contract America in a corporate document, oversaw Talent Management.  Jones testified that Talent Management was "designed to work hand-in-hand" with a firm called American Contracting Services (ACS), which

Dion had helped to operate and which provided the same battery of services as Contract America.

The record includes evidence that although Talent Management remitted payroll taxes, its operation was nonetheless unlawful. Talent Management named itself as the employer of record on the relevant payroll tax forms in order to shield the actual employers' identities from the IRS. Drawing inferences favorable to the verdict, a rational jury could find that Talent Management was a vital, if complementary, component of the payroll tax scheme.[2]

It is, moreover, relevant that both defendants profited from participation in the unlawful scheme. Jones testified that the defendants received a percentage of the fees that Contract America charged, paid to them through their consulting firm Business Management Services (BMS). Receipt of a share of a conspiracy's proceeds may be probative of the recipient's participation in the conspiracy. See United States v. Aleskerova, 300 F.3d 286, 293 (2d Cir. 2002); see also United States v. Pressler, 256 F.3d 144, 153 (3d Cir. 2001); United States v. Dadi, 235 F.3d 945, 950 (5th Cir. 2000).

---

[2] In any event, it is apodictic that under certain circumstances even "lawful activity may furnish the basis for a conviction under § 371." Hurley, 957 F.2d at 4.

The defendants suggest that receipt of a share of the revenues of a conspiracy is materially different than receipt of a share of its profits. In the circumstances of this case, that is a distinction without a difference. Many of the relevant precedents speak of the "proceeds" of the conspiracy, without distinguishing between "revenues" and "profits." See, e.g., United States v. Brown, 727 F.3d 329, 339-40 (5th Cir. 2013); United States v. Shepard, 462 F.3d 847, 867 (8th Cir. 2006); United States v. Smith, 757 F.2d 1161, 1167 (11th Cir. 1985); United States v. Gunter, 546 F.2d 861, 869 (10th Cir. 1976). It is for the jury to determine, on the facts of the particular case, whether sharing in the proceeds of a criminal enterprise evinces participation in the goals of that enterprise.

The foregoing evidence, formidable in itself, is buttressed by the testimony of two clients of the payroll scheme. Gary Alcock (himself charged in the same indictment) was a small business owner who had not remitted payroll taxes to the IRS for many years. His brother Kenneth Alcock (similarly charged) arranged a meeting for him with the defendants. The defendants accepted Gary Alcock as a client. As part of their service plan, they set up a sham corporation to shield his assets from, inter alia, the IRS. They also set him up with payroll services.[3] Some

_____

[3] Notwithstanding the defendants' self-serving protests that they did not set up the Alcocks with Contract America, we think a fair reading of Kenneth Alcock's testimony implicates both

-10-

of Gary Alcock's employees were paid through Contract America, others through Talent Management. In point of fact, Kenneth Alcock testified that some employees were paid through both entities: these workers would receive their regular pay through Talent Management and overtime pay through Contract America.

The record includes additional evidence of the defendants' unlawful intent. They kept in their home a Contract America handout that described the company's proposed (unlawful) scheme. The record also contains an e-mail that Floyd received from Adams discussing a tax avoidance scheme for a particular client. This e-mail is probative of both Contract America's unlawful purpose and Floyd's involvement with the payroll tax scheme. See United States v. Friedman, 300 F.3d 111, 126 (2d Cir. 2002) (holding that "evidence that the defendant participated in conversations directly related to the substance of the conspiracy" is indicative of intent (internal quotation mark omitted)).

We add that "evidence of a defendant's general mindset may be relevant to the issue of his intent." United States v. Mehanna, 735 F.3d 32, 46 (1st Cir. 2013). In this regard, the record makes manifest evidence that both defendants stopped filing federal tax returns in 1996 and, in 1997, joined an organization called Save-a-Patriot, which was committed to resisting the IRS.

---

defendants and indicates that Talent Management and Contract America worked hand-in-hand. At the very least, reasonable jurors could interpret Kenneth Alcock's testimony in this way.

In sum, the record discloses proof that, when viewed in the light most favorable to the verdict, was sufficient for a rational jury to conclude that the defendants knowingly and voluntarily entered an agreement with Adams to promote the payroll tax scheme; that a purpose of the scheme was to facilitate unlawful tax evasion by its clients; and that the defendants undertook a series of overt acts in furtherance of the agreement.

Of course, the defendants strive to convince us that there is an innocent explanation for each piece of evidence. But accepting that argument would require us to wear blinders. That is not our proper function: our focus must be on the evidence as a whole. It suffices if the conclusions that the jury draws from the evidence, although not inevitable, are reasonable. See United States v. Laboy-Delgado, 84 F.3d 22, 26-27 (1st Cir. 1996) (explaining that "it is legally irrelevant that a different jury, drawing alternative inferences, might have reached a different result").

**2.  Count 2: The Warehouse Banking Conspiracy.** Count 2 likewise charges a section 371 conspiracy. The gravamen of the government's case is that the defendants conspired to conceal their clients' identities from the IRS by commingling funds in nominee bank accounts. The defendants do not dispute that Office Services and its successor, Calico, commingled funds. Instead, they seek

-12-

both to distance themselves from the interdicted activities and to persuade us that the activities were lawful.

We start with Dion's claim that the activities were lawful. There was abundant evidence that an object of Office Services was to help particular clients evade the IRS. For example, YVO (Office Services's predecessor-in-interest) advertised repeatedly in the newsletter of Save-a-Patriot — an organization dedicated to resisting the IRS. A typical YVO advertisement offered the company's services in "complete privacy." Weighing this evidence in context, we think that a rational jury could have found this solicitation of tax-defiers probative of unlawful intent. See United States v. Maldonado-García, 446 F.3d 227, 231 (1st Cir. 2006) (observing that evidence may be "buttressed by inferences that reasonably can be drawn from the totality of the circumstances"). This inference is especially compelling here because the defendants used BMS to create sham trusts and corporations to conceal client assets — and many of the affected clients had been referred by the Save-a-Patriot group.

One of the individuals who saw the YVO advertisements was Kenneth Alcock, and his testimony makes the cheese even more binding. In addition to the problems with his brother's business, Kenneth Alcock experienced personal tax problems. Dion offered to help him, using the warehouse banking scheme.

-13-

It would serve no useful purpose to continue to cite book and verse.  Taking the evidence as a whole, a rational jury could easily conclude that the object of Office Services's activities was at least in part unlawful.

This leaves the "not me" arguments.  They involve two claims.  First, both defendants insist that they "had nothing to do with" Calico.  Second, Floyd insists that she was not involved with Office Services.  These claims elevate self-serving optimism over reasonable inference.

To begin, the defendants' denial of any relationship with Calico is nothing but empty rhetoric.  Even if the defendants were not actively involved in the management of Calico, they were surely involved in promoting its services.  They coaxed Thorick into starting the business as a continuation of Office Services, and it offered essentially the same services.  Indeed, Dion trained Thorick to perform those services.  He also helped to set up the computer system that Calico used to execute its warehouse banking operations.  Last — but far from least — Thorick's original customer list was compiled from a roster of Office Services clients; and over time, the defendants augmented Calico's customer base by continuing to refer clients to it.

Floyd's insistence that she was not involved with Office Services is revisionist history.  The record leaves no doubt but that Floyd was hip-deep in the operations of that entity: Floyd was

a trustee of Office Services; she was the person who, with Thorick, opened a bank account for Office Services's Rhode Island branch; she was a signatory of that account; she was the one whose signature stamp was used on outgoing checks for the branch; and she was imbued with authority over at least one other Office Services nominee account.  In addition, Gail Thorick testified that while she "mostly" reported to Dion while operating the Rhode Island branch of Office Services, she sometimes reported to Floyd.

Given the evidence rehearsed above, we are confident that a rational jury, indulging inferences favorable to the verdict, could reasonably have concluded — as this jury did — that the proof was adequate to convict both Dion and Floyd of knowing participation in the warehouse banking scheme.

**3.  Counts 4 and 5: Endeavoring to Obstruct the IRS.** Count 4 charged Dion with corruptly endeavoring to obstruct and impede the due administration of the Internal Revenue Code in violation of 26 U.S.C. § 7212(a).  Count 5 lodged an identical charge against Floyd.  The thrust of the charges is that the defendants "endeavored to obstruct and impede the IRS's ability to determine [their] income and to assess taxes [that they] owed."

As the plain language of the statute suggests, the government had to prove that the defendants "1) corruptly, 2) endeavored, 3) to obstruct or impede the due administration of the Internal Revenue laws." United States v. Marek, 548 F.3d 147, 150

-15-

(1st Cir. 2008). While we have had scant occasion to explore the contours of this statutory provision, there is a consensus among the courts of appeals that "corruptly," as used in section 7212(a), means acting with an intent to procure an unlawful benefit either for the actor or for some other person. See, e.g., United States v. McBride, 362 F.3d 360, 372 (6th Cir. 2004); United States v. Kelly, 147 F.3d 172, 177 (2d Cir. 1998); United States v. Winchell, 129 F.3d 1093, 1098 (10th Cir. 1997); United States v. Valenti, 121 F.3d 327, 331-32 (7th Cir. 1997); United States v. Wilson, 118 F.3d 228, 234 (4th Cir. 1997); United States v. Workinger, 90 F.3d 1409, 1414 (9th Cir. 1996); United States v. Dykstra, 991 F.2d 450, 453 (8th Cir. 1993); United States v. Popkin, 943 F.2d 1535, 1540 (11th Cir. 1991); United States v. Reeves, 752 F.2d 995, 1001 (5th Cir. 1985). Even actions that would otherwise be lawful may transgress the statute if they are undertaken with the intention of securing an unlawful benefit. See Wilson, 118 F.3d at 234.

The defendants' insufficiency challenges to their convictions on these counts focus on what the evidence does not show. They point out, for example, that the record is barren of any proof that they earned enough to pay taxes during the relevant time frame, or that they filed false tax returns, or that they were audited by the IRS. But any such omissions in the government's proof are irrelevant to the validity of their convictions. A conviction for violation of section 7212(a) does not require proof

-16-

of either a tax deficiency, <u>see</u>, <u>e.g.</u>, <u>Marek</u>, 548 F.3d at 150-55, or an ongoing audit, <u>see</u>, <u>e.g.</u>, <u>United States</u> v. <u>Wood</u>, 384 F. App'x 698, 704 (10th Cir. 2010) (collecting cases).[4]

While the filing of false tax documents may be "a quintessential violation of the statute," <u>Marek</u>, 548 F.3d at 150, it is not the only way in which the statute can be violated. Certainly, concealment of income or other assets from the IRS can form the basis for a violation of the statute. <u>See</u>, <u>e.g.</u>, <u>Popkin</u>, 943 F.2d at 1540-41.

The defendant's better argument is that the government's proof relies "solely on the structure of bank accounts and corporations." But this argument understates the import of the government's proof. The government introduced evidence showing that, over the course of several years, large sums of third-party money were filtered through the defendants' companies. Payments were made from the warehouse accounts to both defendants, and cash was withdrawn. The defendants derived income from that monetary stream, and they commingled that income with clients' funds in what the jury supportably could have concluded was a ploy to frustrate IRS detection.

_____

[4] We are aware that the decision in <u>United States</u> v. <u>Kassouf</u>, 144 F.3d 952, 957-58 (6th Cir. 1998), is arguably to the contrary. But <u>Kassouf</u> has been limited by the Sixth Circuit to its peculiar facts, <u>see</u> <u>United States</u> v. <u>Bowman</u>, 173 F.3d 595, 600 (6th Cir. 1999), and we do not regard it as good law.

-17-

Based on the totality of this evidence, we think that the jury was entitled to infer that the defendants had corruptly endeavored to impede the IRS's computation of their tax liability and that they had undertaken this course of action to benefit themselves. The government's proof was, therefore, sufficient to convict on counts 4 and 5.

### B. Suppression.

We turn next to the defendants' importunings that some of the evidence should have been suppressed. These importunings have their genesis in the Fourth Amendment, see U.S. Const. amend. IV, which demands that search warrants issue only upon a showing of probable cause. To achieve this benchmark, there must be both "probable cause to believe that a crime has been (or is being) committed" and probable cause to believe "that evidence of [the crime] can likely be found at the described locus at the time of the search." United States v. Ricciardelli, 998 F.2d 8, 10 (1st Cir. 1993) (emphasis omitted). If a search warrant issues in the absence of either of these elements, the customary remedy is suppression of any evidence seized in an ensuing search. See United States v. Brunette, 256 F.3d 14, 19 (1st Cir. 2001).

Like most general rules, this rule admits of exceptions. Even if a warrant issues upon an insufficient showing of probable cause, suppression may be inappropriate if the officers involved

have exhibited objective good faith.  See United States v. Leon, 468 U.S. 897, 918-23 (1984); Brunette, 256 F.3d at 19.

In this instance, the defendants unsuccessfully sought to suppress evidence seized in a search of their office (44 Depot St., Uxbridge, Mass.) and in two searches of their home (18 Wendy Lane, Uxbridge, Mass.).  "In reviewing a district court's denial of a motion to suppress, we assess factual findings for clear error and evaluate legal rulings de novo."  United States v. Garcia-Hernandez, 659 F.3d 108, 111 (1st Cir. 2011) (internal quotation marks omitted), cert. denied, 132 S. Ct. 1873 (2012); accord United States v. Fagan, 577 F.3d 10, 12 (1st Cir. 2009).  This review is highly deferential.  "If any reasonable view of the evidence supports the denial of a motion to suppress, we will affirm the denial." United States v. Boskic, 545 F.3d 69, 77 (1st Cir. 2008).

**1.    The 2003 Office Search.**  On January 13, 2003, a magistrate judge issued warrants authorizing the Postal Inspection Service (USPIS) to search the building at 44 Depot St. and mailbox #5 (located in front of the building).  The warrants were issued in connection with a USPIS investigation into the manufacture and sale by Dion, doing business as PT Resource Center, of phony identification cards.  The bogus cards included replicas of international driving permits (IDPs).

A 15-page affidavit of postal inspector Regina Faulkerson formed the evidentiary predicate for the warrants.  Her affidavit

described the activities of PT Resource Center; catalogued (allegedly false) representations made on the PT Resource Center website; and outlined Dion's and PT Resource Center's ties to the Depot St. location.

To establish a connection between Dion and the site, Faulkerson relied in part on Dion's 1999 affidavit in an unrelated matter. Pertinently, that affidavit vouchsafed that Dion conducted business at the Depot St. location; that he was a proprietor of the firms operating there (including PT Resource Center); and that he used mailbox #5.

In this venue, the defendants make a two-pronged argument. First, they argue that the district court erred in its assessment of the commission element of the probable cause inquiry (i.e., that a crime had been committed) because it incorrectly concluded that producing "novelty IDs" is itself illegal. Second, they argue that the court erred in relying on Dion's 1999 affidavit to connect the crime to the location because that affidavit was stale.

The first argument collapses of its own weight. It is nose-on-the-face plain that the district court's holding did not depend on a determination that the manufacture of certain types of identification documents is per se illegal. The crimes that the USPIS had under investigation were linked to false representations that PT Resource Center made on its website. The district court,

ruling ore tenus, made clear "whether you look at it as the purchasers . . . wanted fake IDs for bad purposes, or they themselves were victims defrauded into thinking that the identifications were somehow legitimate . . . it's clear that there was probable cause to believe that a crime had occurred or was ongoing." The fact that the court made these findings while discussing the searches of the defendants' home is inconsequential.

The defendants' second argument is no more robust. The premise on which this argument rests is, of course, sound: "an affidavit supporting a search warrant must contain timely information or else it will fail." United States v. Schaefer, 87 F.3d 562, 568 (1st Cir. 1996). But the conclusion that they attempt to draw from this premise is insupportable.

Determining whether information is stale is not a matter of "merely counting the number of days elapsed." Id. Courts sometimes have upheld probable cause determinations based on years-old information. See, e.g., United States v. McElroy, 587 F.3d 73, 77-78 (1st Cir. 2009); United States v. Morales-Aldahondo, 524 F.3d 115, 119 (1st Cir. 2008); Schaefer, 87 F.3d at 568. Everything depends on context.

The need to erect a contextual framework requires a reviewing court to look to a wide variety of factors. Typically, these factors include such things as "the nature and characteristics of the supposed criminal activity . . . [and] the

nature of the items delineated in the warrant." Schaefer, 87 F.3d at 568. "The longer the expected duration of the criminal activity and the longer the expected life of the items attendant to it, the more likely that a datum from the seemingly distant past will be relevant to a current investigation." Id.

With an eye to context, the district court's conclusion was eminently reasonable. Dion's 1999 affidavit stated that he was an owner of PT Resource Center, that PT Resource Center was based at 44 Depot St., and that it used mailbox #5 in conducting its business. The PT Resource Center website, which advertised the IDPs on an ongoing basis, confirmed this connection.

There is more. Shortly before the warrants issued, undercover investigators requisitioned IDPs from PT Resource Center by sending an order form to 44 Depot St. Relatedly, the 44 Depot St. postal carrier confirmed that he delivered mail in the name of William Scott Dion to that address. These recent developments indicated that the criminal activity (and Dion's connection to it) was enduring and, thus, corroborated and refreshed the older information contained in Dion's 1999 affidavit. As a result, the information was timely. As this case aptly illustrates, otherwise stale facts can be revivified and made relevant for search warrant purposes by more recent confirmation. See McElroy, 587 F.3d at 77-78 & n.5; Schaefer, 87 F.3d at 568.

Similarly, the nature of the items to be seized militates against suppression. The warrant primarily sought business records. Business records, as a class, are repositories of historical facts and, therefore, are largely immune from claims of staleness. See, e.g., United States v. Abboud, 438 F.3d 554, 574 (6th Cir. 2006); United States v. Hershenow, 680 F.2d 847, 853-54 (1st Cir. 1982).

That ends this aspect of the matter. The information before the magistrate judge was more than enough to tie Dion to 44 Depot St. and to support a reasonable belief that evidence of a crime might be found there.

**2.  The 2003 Home Search.** While the 2003 office search was underway, postal agents went to the defendants' home at 18 Wendy Lane. They entered the house with Dion's consent and interviewed the defendants and Dion's father.[5] Based on the information gleaned in those interviews and plain-sight observations made at the time, the agents formed a belief that evidence of the crimes under investigation would be found in the home.

Inspector Faulkerson relayed the necessary information to a postal inspector, who prepared an affidavit that paved the way

---

[5] A homeowner's voluntary consent to an entry into his home obviates the need for a warrant. See Illinois v. Rodriquez, 497 U.S. 177, 181 (1990); United States v. Laine, 270 F.3d 71, 74-75 (1st Cir. 2001).

for the issuance of an additional search warrant.  A search of the home ensued.

In challenging this search, the defendants do nothing more than repackage and reassert their objections to the earlier search of 44 Depot St.  These objections, in their repackaged form, are no more convincing.  Consequently, we reject them out of hand.

**3.    The 2004 Home Search**.  On March 19, 2004, a magistrate judge issued a warrant authorizing the search of 18 Wendy Lane.  This warrant was founded upon the affidavit of an IRS agent, David Toy.  In his affidavit, Agent Toy carefully chronicled the putative crimes and delineated their connection to 18 Wendy Lane.  He drew on a variety of sources, including his "personal participation in [the] investigation [of the defendants], information received by [him] from other federal law enforcement officers, [his] interviews of witnesses, [his] review of documents and records, a recorded telephone call, and [his] training and experience as a criminal investigator."

The defendants posit that this affidavit does not satisfy either element of the two-pronged probable cause standard.  They begin by branding the affidavit as consisting mainly of unsupported conclusions.  Apart from these conclusions, the defendants say, the affidavit contains nothing more than innocuous descriptions of legal activities.

This argument is futile. We have, with a regularity bordering on the echolalic, endorsed the concept that a law enforcement officer's training and experience may yield insights that support a probable cause determination. See, e.g., United States v. Hicks, 575 F.3d 130, 137 (1st Cir. 2009); United States v. Ribeiro, 397 F.3d 43, 50-51 (1st Cir. 2005); United States v. Jordan, 999 F.2d 11, 14 (1st Cir. 1993); United States v. Aguirre, 839 F.2d 854, 858 (1st Cir. 1988). Here, moreover, the notion that the affidavit contained no evidence of illegality beyond Agent Toy's experience-based conclusions is flatly contradicted by the affidavit's contents. To mine every nugget of factual information from the 43-page affidavit would be pointless. A few examples suffice to demonstrate the futility of the defendants' argument:

- The affidavit recounts a conversation in which a man identifying himself as Charles Adams told an undercover agent about the unlawful array of services offered by Contract America.

- Documents seized during the 2003 home search and referenced in Agent Toy's affidavit included a Contract America business card.

- Subpoenaed bank records linked Contract America to Floyd.

- Voluminous information attested to the defendants' establishment of warehouse and

-25-

offshore bank accounts and multiple mail drops, all of which, when viewed in context, could reasonably be seen as potential means to evade IRS scrutiny.

Given these and other facts, it was reasonable for the magistrate judge to draw the commonsense conclusion that evidence of tax fraud would likely be found at 18 Wendy Lane. See United States v. Falon, 959 F.2d 1143, 1147 (1st Cir. 1992) (observing that courts "interpret affidavits for search warrants in a commonsense and realistic fashion" (internal quotation marks omitted)).

The defendants next assail the use of certain documents to support the finding of probable cause. They argue that documents seized in the 2003 search at 18 Wendy Lane should have been suppressed and, thus, could not undergird a finding of probable cause in connection with the 2004 home search. This argument is hopeless: the 2003 home search was entirely within the pale, see supra Part II(B)(2), a fact that renders the defendants' redundant efforts to impugn the lawfulness of that search a waste of time.

The defendants next try to discredit the probative value of documents discovered in their trash. They argue that these papers depict only legal transactions. But the defendants are viewing this evidence through rose-colored glasses. Fairly read,

it tied the defendants' home tightly to both Contract America and Talent Management.  Consequently, the documents were probative of a nexus between the location and the crimes alleged.

For these reasons, the 2004 home search was lawful.[6]

### C. **Severance.**

We come now to the defendants' shared claim that they should not have been tried together with Adams.  This claim arises at the intersection of Federal Rule of Criminal Procedure 8(b), which permits the joinder of two or more defendants in a single indictment, and Federal Rule of Criminal Procedure 14, which empowers the district court to sever a defendant for purposes of trial if joinder "appears to prejudice" him.

This intersection has been extensively mapped.  The general rule is that defendants who are properly joined in an indictment should be tried together.  See United States v. O'Bryant, 998 F.2d 21, 25 (1st Cir. 1993).  This rule has special force in conspiracy cases, in which the severance of coconspirators' trials "will rarely, if ever, be required." United States v. Flores-Rivera, 56 F.3d 319, 325 (1st Cir. 1995) (internal quotation marks omitted).  Because considerable deference is due to the trial court's superior coign of vantage, we review that court's

_____

[6] The district court concluded, as an alternative holding, that the good-faith exception to the warrant requirement validated all three searches.  See Leon, 468 U.S. at 918-23.  Because the denial of the suppression motions on merits-based grounds is unimpugnable, we do not address this alternative holding.

-27-

ruling granting or denying a motion to sever for abuse of discretion. See United States v. Boylan, 898 F.2d 230, 246 (1st Cir. 1990).

The defendants' claim of error has two subsets. They start with the plaint that Adams's defense was both antagonistic to and irreconcilable with their defenses. We do not agree.

The defendants and Adams were charged as participants in the payroll tax conspiracy. Unlike the defendants, Adams — who was also charged with three counts of tax evasion — decided to confess and avoid; that is, he admitted that he intentionally committed and facilitated the proscribed acts, but contended that his good-faith belief that he had no legal obligation to pay income taxes forestalled any finding of guilt. See Cheek v. United States, 498 U.S. 192, 203 (1991). The defendants took a different tack: they eschewed an affirmative defense and instead questioned the adequacy of the government's proof that they acted unlawfully.

Defenses are not antagonistic merely because they are not congruent. "In order to gain a severance based on antagonistic defenses, the antagonism . . . must be such that if the jury believes one defendant, it is compelled to convict the other defendant." United States v. Peña-Lora, 225 F.3d 17, 33 (1st Cir. 2000) (alteration in original) (emphasis in original) (internal quotation marks omitted). Put another way, "the tension between defenses must be so great that a jury would have to believe one

defendant at the expense of the other." United States v. Yefsky, 994 F.2d 885, 897 (1st Cir. 1993).

No troubling antagonism existed here: the jury could have accepted both that Adams intentionally committed fraud and that the defendants lacked the same culpable state of mind. See, e.g., United States v. Voigt, 89 F.3d 1050, 1095-96 (3d Cir. 1996); United States v. Martinez, 979 F.2d 1424, 1431 (10th Cir. 1992); cf. United States v. Throckmorton, 87 F.3d 1069, 1071-72 (9th Cir. 1996) (finding severance not required when codefendant "intended to implicate [defendant], admit that the drug transaction occurred, but contend he was involved solely as a DEA informant"). While the defendants may have been uncomfortable with Adams's frank admissions, the defenses were neither irreconcilable nor even substantially incompatible. Accordingly, severance was not required on this basis. See United States v. DeCologero, 530 F.3d 36, 52-53 (1st Cir. 2008).

The defendants' second ground for severance is equally unavailing. They assert that a spillover effect from Adams's presence as a defendant unfairly prejudiced them to such a degree as to require separate trials. Specifically, they assert that the evidence used to convict Adams (including Adams's own testimony) was bound to provide proof of their criminal intent — proof that would not have been admissible in a separate trial.

These assertions contain more cry than wool. Demonstrating unfair prejudice sufficient to require severance of coconspirators' trials "is a difficult battle for a defendant to win." Boylan, 898 F.2d at 246. The defendants have not come close to winning the battle here.

The defendants try to marry their claim of unfair prejudice to Adams's role in the Save-a-Patriot organization. But the defendants' ties with the Save-a-Patriot organization form a legitimate part of the government's case against them; and in any event, the record contains ample evidence, independent of Adams's testimony, to bind the defendants to the Save-a-Patriot organization. The most obvious example of this independent evidence is the defendants' membership in the organization.

To be sure, the defendants might well have been advantaged by a separate trial. But that is not the test of whether severance must be granted. See id. (explaining that, in the severance context, "prejudice means more than just a better chance of acquittal at a separate trial" (internal quotation marks omitted)).

We need not tarry. Much of the evidence about which the defendants complain would have been admissible against them even if they had been tried separately from Adams. It follows that this evidence does not furnish a plausible basis for severance. See O'Bryant, 998 F.2d at 26 ("Where evidence featuring one defendant

is independently admissible against a codefendant, the latter cannot convincingly complain of an improper spillover effect."). For aught that appears, the remainder of the evidence, if prejudicial at all, caused nothing beyond the "garden-variety" prejudice that we consistently have found insufficient to require severance. Boylan, 898 F.2d at 246.

We add a coda. To the extent that there was any spillover from evidence that might not have been admissible against the defendants in a separate trial, the district court took effective measures to palliate spillover prejudice. Where, as here, "[t]here were appropriate limiting instructions as to the admissibility of evidence against particular defendants and as to the need to determine guilt on an individual basis," id., no more is exigible.

We conclude, without serious question, that the district court acted well within the encincture of its discretion when it denied the defendants' motions for severance.

### D. Federal Register Act.

The defendants claim that the district court should have dismissed counts 4 and 5 because the IRS did not comply with the Federal Register Act, 44 U.S.C. § 1505(a)(1), in connection with the statute on which those counts were based (26 U.S.C. § 7212(a)). We first explain the defendants' thesis and then dispose of their claim.

In the Federal Register Act, Congress decreed that certain executive actions must be recorded in the Federal Register. See 44 U.S.C. § 1505(a)(1). After the enactment of 26 U.S.C. § 7212(a), the IRS did not publish implementing regulations in the Federal Register. Building on this foundation, the defendants suggest that enforcing section 7212(a) against them transgresses their constitutional rights to notice and due process. This suggestion presents a pure question of law, which we review de novo. See United States v. Moore, 286 F.3d 47, 49 (1st Cir. 2002).

By its plain terms, the statutory provision upon which the defendants rely, 44 U.S.C. § 1505(a)(1), applies to presidential proclamations and executive orders. The law is settled beyond hope of contradiction that the provision has no application to criminal statutes enacted by Congress. See United States v. Walls, 546 F.3d 728, 740 (6th Cir. 2008); United States v. Schiefen, 139 F.3d 638, 639 (8th Cir. 1998) (per curiam). Congress's enactment of a criminal statute and the statute's subsequent publication in the United States Code, without more, puts prospective defendants on fair notice.[7] See Cheek, 498 U.S. at 199; Roberts v. Maine, 48 F.3d 1287, 1300 (1st Cir. 1995) (Cyr, J., concurring).

---

[7] The statutory provision at issue here has been published continuously in the United States Code since at least 1958.

The defendants nonetheless argue that as a precondition to enforcement of the statute of conviction, the Federal Register Act requires the publication of implementing regulations. This argument is woven out of whole cloth.

The defendants wrap their argument in the mantle of the Supreme Court's decision in California Bankers Ass'n v. Shultz, 416 U.S. 21 (1974). There, the Court concluded that the Bank Secrecy Act of 1970 was not "self-executing," id. at 64, so if the agency did not promulgate regulations, "the Act itself would impose no penalties on anyone," id. at 26.

This precedent is inapposite. The Federal Register Act has been described as a "notice" statute. United States v. Floyd, 477 F.2d 217, 222 (10th Cir. 1973). It requires the publication of regulations, not their promulgation. See Kennecott Utah Copper Corp. v. U.S. Dep't of Interior, 88 F.3d 1191, 1205 (D.C. Cir. 1996) (explaining the purpose of the Act as "protect[ing] regulated entities from . . . the government's failure to publish duly-approved regulations"). The statute of conviction here is self-executing and no regulations are needed to effectuate it. See, e.g., Marek, 548 F.3d at 150, 155. This is why courts that have faced similar Shultz-based attacks on other provisions of the Internal Revenue Code have repulsed those attacks. See United States v. Dawes, 161 F. App'x 742, 745 (10th Cir. 2005); Watts v. IRS, 925 F. Supp. 271, 277 (D.N.J. 1996).

We hold that the defendants' claim of a Federal Register Act violation is without merit.

### E. Sentencing.

The district court meted out prison sentences of 84 months to Dion, 60 months to Floyd, and 48 months to Adams. It sentenced other coconspirators, who did not go to trial, more leniently. Dion claims that his sentence reflects an unwarranted disparity.

We review a district court's bottom-line sentencing determination for abuse of discretion. See United States v. Flores-Machicote, 706 F.3d 16, 20 (1st Cir. 2013). Within this rubric, we assay the district court's findings of fact for clear error and its application of the sentencing guidelines de novo. See id. "The touchstone of abuse of discretion review in federal sentencing is reasonableness." United States v. Vargas-Dávila, 649 F.3d 129, 130 (1st Cir. 2011).

An assessment of reasonableness "typically involves a two-step pavane." Flores-Machicote, 706 F.3d at 20. The first step entails an inquiry into the incidence of procedural errors. See id. "Once we are assured that the sentence is not infected by procedural error, we then proceed to evaluate its substantive reasonableness." Id.

Dion frames his claim as a complaint about the substantive reasonableness of his sentence. The central premise of

his complaint is that he was similarly situated to his coconspirators, yet sentenced more harshly. With this premise in place, he invokes a provision of the Sentencing Reform Act that directs a sentencing court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

Dion's premise is faulty in two salient respects. First, Dion focuses on the wrong universe. In enacting section 3553(a)(6), "Congress's concern was mainly with minimization of disparities among defendants nationally rather than with disparities among codefendants engaged in a common conspiracy." United States v. Vargas, 560 F.3d 45, 52 (1st Cir. 2009).

Second — and perhaps more important — Dion's premise is undercut by the record. The district court supportably found that Dion was more culpable than his coconspirators. In this vein, it found that Dion was the mastermind of the conspiracies. See USSG §3B1.1(a) (directing four-level enhancement for organizer or leader). Floyd and Adams performed lesser roles, see id. §3B1.1(b) (directing lower enhancement for manager or supervisor), and nothing in the record indicates that any of the remaining coconspirators received upward role-in-the-offense adjustments. It is too obvious to warrant citation of authority that an offender

who sits at the top of a criminal hierarchy is not similarly situated to his underlings.

There are other differences as well. For example, the district court found that Dion was responsible for a substantially larger tax loss than Adams because Adams did not participate in the warehouse banking scheme. See id. §2T4.1(H), (J). So, too, the remaining coconspirators cooperated with the government and/or accepted responsibility. Such distinctions can justify differential treatment at sentencing. See United States v. Dávila-González, 595 F.3d 42, 50 (1st Cir. 2010).

Stripped of flawed comparisons, Dion's claim that his sentence is substantively unreasonable is a pipe dream. The district court calculated Dion's guidelines sentencing range as 121 to 151 months. The court then ameliorated this range through a downward variance to 84 months.

When, as in this case, a district court essays a substantial downward variance from a properly calculated guideline sentencing range, a defendant's claim of substantive unreasonableness will generally fail. See, e.g., United States v. Williams, 630 F.3d 44, 52 (1st Cir. 2010); United States v. Glover, 558 F.3d 71, 82-83 (1st Cir. 2009). Dion's claim falls within this generality, not within the long-odds exception to it. We discern no hint of an abuse of discretion in the district court's disposition.

## III.  CONCLUSION

We need go no further.  For the reasons elucidated above, the judgment of the district court is

**Affirmed.**